[No. D057204. Fourth Dist., Div. One. Apr. 27, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
JOYCE JASKA, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of part III.B., C., D., E. F., and the concurring and dissenting opinion.

Counsel

Donald Weller Jordan for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Rhonda Cartwright-Ladendorf, Stacy Tyler, Michael T. Murphy and Collette C. Cavalier, Deputy Attorneys General, for Plaintiff and Respondent.

Opinion

**AARON, J.—**

## I.

## INTRODUCTION

A jury found Joyce Jaska guilty of five counts of grand theft by embezzlement (Pen. Code, § 487, subd. (a)),[1] three counts of filing a false income tax return (Rev. & Tax. Code, § 19705, subd. (a)), three counts of filing a false amended tax return (*ibid.*), and five counts of committing perjury by declaration (§ 118). The jury found that in committing the grand theft counts, Jaska took property valued at more than $50,000 (former § 12022.6, subd. (a)), and more than $150,000 (former § 12022.6, subd. (b)). The jury also found true an aggravated white-collar crime enhancement (§ 186.11, subd. (a)(1)), which alleged that the grand theft counts were related felonies that included fraud or embezzlement as a material element, and involved the taking of more than $100,000.[2]

The trial court sentenced Jaska to 12 years in prison and imposed a $3,200 restitution fine under section 1202.4. At a subsequent hearing, the trial court imposed a $300,000 fine under section 186.11, subdivision (c), and ordered Jaska to pay restitution in the amount of $499,999, at 10 percent interest per annum, from May 1, 2002.

On appeal, Jaska contends that all but one of her five grand theft convictions must be reversed because all of the grand theft counts were based on a series of thefts committed against a single victim, pursuant to one

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

[2] The jury found not true a separate aggravated white-collar crime enhancement allegation, which alleged the grand theft counts involved the taking of more than $500,000. (§ 186.11, subd. (a)(2).)

intention, one general impulse and one plan.[3] Jaska also contends that the trial court erred by allowing an expert witness from California's Franchise Tax Board to testify based on inadmissible exhibits supplied by the district attorney's office, and that her trial counsel provided ineffective assistance by failing to object to the testimony or the exhibits. Jaska further claims that the trial court abused its discretion by refusing to release more than $100,000 from a lis pendens recorded on her residence pursuant to section 186.11, subdivision (e)(2), to allow her to retain counsel of her choice. Additionally, Jaska challenges a $300,000 fine imposed pursuant to section 186.11, subdivision (c), and a restitution order in the amount of $499,999, imposed pursuant to section 186.11, subdivision (d). We reject all of these contentions.

Jaska also contends that she is entitled to additional conduct credits pursuant to a January 2010 amendment to former section 4019. We agree that the January 2010 amendment applies to this case, and remand the matter to the trial court for a determination of any additional presentence credits to which Jaska may be entitled.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Background*

Michael Rajacich (Michael) established Barstow Truck Parts and Equipment, Inc. (BTP), under the name Barstow Steel in the 1950's, near the site of the family residence on Main Street in Barstow. Michael was the father of James Rajacich (Jim) and Marsha Rajacich (Marsha). Marsha inherited 29 percent of the BTP stock when Michael died in 1992; Jim held the remaining 71 percent.

Starting in 1968, Jim, who had worked at Barstow Steel since he was a child, began running the business. He also incorporated the business and changed its name to BTP. BTP and its two subsidiaries buy large-scale scrap from the military and resell it. They also lease equipment and pave roads.

BTP had two corporate officers: Jim, who was president, and Jaska, who was secretary-treasurer. Jaska is the niece of the late Michael and the first cousin of Jim and Marsha, who have known her all of her life. In 1987, Michael hired Jaska, who has an accounting degree from the University of the Pacific, as BTP's office manager. Jaska worked as BTP's office manager

---

[3] We consider this contention in the published portion of this opinion, and the remainder of Jaska's contentions in the unpublished portion.

from 1987 to April 2002. Jim fully trusted Jaska. Jaska's job was to supervise office personnel, conduct general business for BTP, prepare reports, and handle BTP's accounting. Her responsibilities included paying bills and providing payroll information to Paychex, an outside company that prepared the payroll checks for all BTP employees. Jaska signed all checks issued on BTP accounts.[4]

### B. *BTP's financial practices and problems*

BTP started having serious financial problems in 1997. By 2001, banks were returning BTP checks, totaling hundreds of thousands dollars, every month due to insufficient funds. Many vendors refused to accept BTP's checks because so many had been returned for insufficient funds.

BTP also employed numerous questionable accounting practices. For example, BTP did not properly withhold income tax and Social Security payments from its payroll. By 2001, the Internal Revenue Service (IRS) had placed liens on BTP's equipment and required the business to make weekly payments. When Jaska informed Jim and Marsha about the IRS liens, Jaska told them that she had not withheld income tax and Social Security payments from BTP's payroll checks because BTP was not bringing in enough money.

BTP also failed to properly account for "scrap checks" that the company used to pay for the purchase of scrap metal. Over time, the "scrap" account evolved into a miscellaneous account in which an accounting office employee would place an entry if she was unsure where it belonged.

Another troublesome BTP accounting office practice involved the record keeping associated with loans made to the company. On several occasions, Jaska claimed to have loaned BTP money for short periods of time, usually a day or two days. Jaska told a police detective that she had loaned money to BTP many times, in the amounts of $5,000 to $10,000. An auditor could not find any records of loans made to BTP; the only evidence of the purported loans came from ledger entries of checks payable to Jaska that were coded "loan payback."

Sue Ellen Tankersley, an investigative auditor for the California Department of Justice (DOJ), testified that BTP's sloppy record keeping demonstrated "a clear intent for subterfuge or hiding the ball or creating mass confusion. . . . [¶] So based on those things, and the general state of the documentation of

---

[4] At one point, two employees of the accounting office left material on Jim's desk concerning suspected irregularities in the office. The material was returned to the employees, unopened.

the books and records for [BTP], in my mind clearly there was a—a large embezzlement going on here."

## C. *The end of Jaska's employment with BTP*

In January 2000, Marsha returned to Barstow from Kansas City, where she had been running a family business for two decades. Jim asked Marsha to support BTP by lending it $400,000. After Marsha arranged a $400,000 line of credit, she moved back to Kansas City. Marsha returned to Barstow in October 2001 and sensed that something was wrong at BTP. The following month, she began looking into the company's financial condition.

In early 2002, Marsha noticed that the trash bin outside of BTP's facility was full of shredded paper. Gordon Kruse, BTP's general manager, saw 17 bags of shredded paper. In April 2002, Marsha hired Jennifer Pervinkler, an accountant, to conduct an audit of BTP. Pervinkler went through BTP's ledgers, records, bank statements and copies of checks. Many BTP records were missing, and those that were found were not in any kind of order. Only a quarter of the checks that were drawn on BTP accounts from 1997 to 2002 were found; the remainder had to be ordered from BTP's banks. The audit took a year to complete.

On April 22, 2002, Jim, Marsha, Jaska and Kruse met to discuss BTP's financial situation. Jaska did not return after a lunch break for the resumption of the meeting, and never returned to BTP.

On May 15, 2002, Marsha asked the Barstow Police Department to institute a criminal investigation into embezzlement at BTP; Marsha identified Jaska as a suspect. Detective Andrew Espinoza interviewed Jaska on June 26, 2002. Jaska told him that other persons had taken money from BTP. The following morning, Espinoza executed a search warrant on the Jaska residence and arrested Jaska. Espinoza seized the tax returns for Jaska and her husband, along with other items.

## D. *The charged offenses*

### 1. *The grand theft-embezzlement counts*

Count 1 pertained to BTP's petty cash account, which was maintained in the accounting office. According to Jim, Jaska was in charge of the petty cash account. However, Jaska told a police detective that other individuals who worked in the accounting office were responsible for petty cash, and claimed that she did not have access to the petty cash account nor anything to do with it. When a BTP employee needed petty cash for reimbursement for a

company expense, the employee was supposed to provide a receipt for the expenditure. Jaska, however, often turned in a calculator tape with a dollar amount on it in lieu of a receipt, and was reimbursed in cash. Every month—and sometimes more than once a month—Jaska took either $600 or $700 from petty cash for her car maintenance and repair expenses, without a supporting receipt. Jaska told an employee in the BTP accounting office that Jim had authorized cash reimbursement for her automobile maintenance and repair expenses.[5]

The petty cash account was abused in other ways, as well. For example, the accounting office staff routinely used petty cash to pay for their lunches when they went out as a group—sometimes without Jaska—up to five times a week.

The balance that was maintained in the petty cash account was as much as $5,000. Annual summaries show that in 1999 the total amount of petty cash used at BTP was $128,755.74; in 2000 it was $97,273.71; in 2001 it was $91,818.93; and in 2002, through April 15, it was $24,999.55.

Tankersley, the DOJ investigator, testified that she had never seen a petty cash account abused as much as BTP's petty cash account. Tankersley explained that petty cash is defined as $100 or less. However, Tankersley said that more than $2,500 a week was disbursed from the BTP petty cash account, without documentation. According to Tankersley, this "clearly indicates fraud."

Counts 2 and 3 involved Jaska's use of BTP checks to make payments on her personal American Express and Visa credit card accounts. Jim never authorized Jaska to pay her personal credit card bills with BTP checks.

In 1998, Jaska used BTP funds to pay $11,681.39 for charges to her personal American Express account; in 1999, the figure was $34,265.59; and in 2000, the figure was $42,006.42. In 2001, Jaska used BTP money to pay $54,253.88 for charges to her personal American Express account; and in 2002 (up until Apr. 15), the figure was $21,803.37. Jaska used a total of $164,010.65 in BTP funds to pay charges on her personal American Express card from 1998 to 2002.

With respect to Jaska's personal Visa account, Jaska used BTP checks to pay $2,500 in charges in 1997; $42,384.22 in charges in 1998; $37,686.35 in charges in 1999; $16,893.38 in charges in 2000; $15,523.11 in charges in

---

[5] Jim testified that he never authorized Jaska to use the petty cash account for her personal expenses or travel.

2001; and $6,774.84 in charges in 2002 up until April 15. Jaska used a total of $121,761.90 of BTP funds to pay charges on her personal Visa account during this period of more than five years.

Count 4 pertained to the theft of funds from BTP's payroll account. Jim understood Jaska's salary to be $45,000 per year, which also was the amount that Jaska told the IRS she received from BTP as her salary.[6] Jim never approved a higher salary for Jaska.

Jaska came up with the idea of issuing "scrap checks" in lieu of payroll checks to BTP employees. Under this plan, BTP avoided paying withholding taxes. Jim told Jaska that issuing "scrap" checks instead of paychecks was not a good idea. He received one "scrap" salary check and told Jaska not to do this again. Despite this admonition, Jaska continued to issue "scrap" checks to pay employees' salaries—including her own—even though she knew that doing so was illegal. Kruse testified that Jaska issued "scrap" salary checks over a period of more than six months. Jaska also had "scrap checks" issued to herself for undisclosed reasons.

The audit showed the following: In 1998, Jaska received gross pay of $58,850, and reimbursement of $6,425 and $17,900 in scrap checks. In 1999, Jaska received gross pay of $71,250, reimbursement of $10,121.57, and $27,025 in scrap checks. In 2000, Jaska received gross pay of $53,750, reimbursement of $7,400, and $46,555.55 in scrap checks. In 2001, Jaska received gross pay of $57,500, reimbursement of $10,000, and $46,800 in scrap checks.

Count 5 pertained to Jaska's use of BTP funds to pay for a car. Jaska drove a red 1999 Volvo to work daily. Jaska leased the Volvo from Enterprise Fleet Management (Enterprise), from which BTP purchased used pickup trucks for use in its business. The lease for the Volvo required a payment in the amount of $10,750 for "capital cost" on delivery, and a monthly fee of $614.87. Jaska paid the "capital cost," but used BTP funds to pay the monthly fees.[7] From April 1999 through March 2002, the monthly payments for the Volvo were made from a BTP account. BTP also paid an extra $10,947.20 as paydown on the lease, as well as license renewal fees. The audit showed that BTP paid Enterprise a total of $27,370.70 from 1999 to 2002 in connection with Jaska's lease.

Jim never authorized Jaska to lease or purchase an automobile, or to use BTP funds to pay for the Volvo. He never authorized any reimbursement for

---

[6] During the police interview with Espinoza, Jaska said that her starting salary was $45,000, and that her salary eventually rose to $75,000 per year.

[7] Jaska paid Enterprise $9,083.13 in April 2002 to effect an early buyout of the lease.

expenses associated with the Volvo because Jaska did not use the car for BTP business. Jaska had not discussed the Volvo with Jim. However, Jaska told an accounting office employee that Jim had agreed to provide her with funds for monthly vehicle maintenance and repair from petty cash.

### 2. The perjury and tax counts

Jaska filed joint tax returns with her husband, Wesley Jaska (Wesley).[8] The Jaskas underreported their income in their California tax returns for the years 1999, 2000 and 2001, and in their amended California tax returns for those years.[9]

Walter Perez, a special agent with the Franchise Tax Board, testified that "income" means any cash or equivalent, regardless of whether it was legitimately earned or stolen. For example, although income would include the monthly rental fees for the Volvo that were paid from a BTP account, the Jaskas failed to report this income on their returns. The Jaskas also did not report as income the money that Jaska received from the BTP petty cash account.

The prosecution presented evidence that the Jaskas also failed to report the money that BTP paid on their American Express and Visa credit card accounts, or the extra BTP wages paid to them. The unreported 1999 income was $139,139.35; the unreported income for 2000 was $143,439.28; and the unreported income for 2001 was $177,052.44. The Jaskas' total unreported income for the three years was $459,631.07.

### III.

### DISCUSSION

A. *There is substantial evidence in the record to support the jury's verdicts finding Jaska guilty of multiple counts of grand theft by embezzlement*

Jaska contends that her convictions on all but one of the counts of grand theft by embezzlement (counts 1–5) must be reversed because all of the

---

[8] Wesley was a captain with the Barstow Fire Department and a part-time BTP employee in charge of the company's computers. He was charged and tried together with Jaska. The jury convicted Wesley of three counts of perjury by declaration, three counts of filing a false amended tax return, and three counts of signing a false tax return without the intent to defraud—a lesser-included offense of filing a false tax return. Wesley is not a party to this appeal.

[9] The amended tax returns were signed and filed in December 2002. Jaska told her accountant that an attorney had advised her to file amended returns.

counts are based on a series of thefts committed against a single victim, pursuant to one intention, one general impulse and one plan.

1. *Governing law*

    a. People v. Bailey *(1961) 55 Cal.2d 514, 519 [11 Cal.Rptr. 543, 360 P.2d 39]*

■ "In general, a person may be *convicted* of, although not *punished* for, more than one crime arising out of the same act or course of conduct. 'In California, a single act or course of conduct by a defendant can lead to convictions "of *any number* of the offenses charged." [Citations.]' [Citation.]" (*People v. Reed* (2006) 38 Cal.4th 1224, 1226–1227 [45 Cal.Rptr.3d 353, 137 P.3d 184].) However, "a defendant may be properly convicted upon separate counts charging grand theft from the same person" only if the evidence shows "that the offenses are separate and distinct and were not committed pursuant to one intention, one general impulse, and one plan." (*People v. Bailey, supra,* 55 Cal.2d at p. 519 (*Bailey*).)

In *Bailey*, the defendant made misrepresentations that enabled her to receive welfare payments, each of which was less than $200, but which in total amounted to more than $3,000. (*Bailey, supra,* 55 Cal.2d at pp. 515–516, 518.) A jury found the defendant guilty of a single count of grand theft. (*Id.* at p. 515.) At the time of the defendant's conviction, the theft of property worth more than $200 constituted grand theft. (*Id.* at p. 518.) The trial court granted the defendant's motion for a new trial on a separate jury instruction issue, and the People appealed. (*Id.* at pp. 515–517.) After concluding that the trial court had erred in granting the motion for new trial on the jury instruction issue, the Supreme Court considered "whether [the defendant] was guilty of grand theft or of a series of petty thefts since it appears that she obtained a number of payments, each less than $200 but aggregating more than that sum." (*Id.* at p. 518.)

The *Bailey* court held that the defendant was properly convicted of a single count of a grand theft. The court reasoned: "Several recent cases involving theft by false pretenses have held that where as part of a single plan a defendant makes false representations and receives various sums from the victim the receipts may be cumulated to constitute but one offense of grand theft. [Citations.] The test applied in these cases in determining if there were separate offenses or one offense is whether the evidence discloses one general intent or separate and distinct intents. The same rule has been followed in larceny and embezzlement cases, and it has been held that where a number of takings, each less than $200 but aggregating more than that sum, are all motivated by one intention, one general impulse, and one plan, the offense is grand theft. [Citations.]" (*Bailey, supra,* 55 Cal.2d at pp. 518–519.)

■ While the precise issue before the *Bailey* court involved the aggregation of separate petty thefts to constitute a single grand theft, the *Bailey* court also indicated that a defendant may not be convicted of *more* than one count of grand theft where all of the takings are committed against a single victim with one intention, one general impulse, and one plan: "Whether a series of wrongful acts constitutes a single offense or multiple offenses depends upon the facts of each case, and a defendant may be properly convicted upon separate counts charging grand theft from the same person if the evidence shows that the offenses are separate and distinct and were not committed pursuant to one intention, one general impulse, and one plan. [Citation.] In the following cases it was held that each receipt of property obtained by false pretenses constituted a separate offense for which the defendant could be separately charged and convicted. [Citations.] Although none of these decisions discussed the rule set forth above, it does not appear that the convictions would have been affirmed had the evidence established that there was only one intention, one general impulse, and one plan." (*Bailey, supra*, 55 Cal.2d at p. 519.)

### b. Bailey*'s progeny*

Because the underlying facts of cases that involve a series of grand thefts are critical in determining whether a defendant may be convicted of only a single count of grand theft, or instead, multiple counts, we discuss in detail the three principal cases that Jaska cites on appeal in support of her *Bailey* claim. In *People v. Richardson* (1978) 83 Cal.App.3d 853 [148 Cal.Rptr. 120] (*Richardson*), disapproved on other grounds in *People v. Saddler* (1979) 24 Cal.3d 671, 682 [156 Cal.Rptr. 871, 597 P.2d 130], a jury found the defendant guilty of multiple felonies, including four counts of attempted grand theft, based on "a scheme whereby City of Los Angeles Controller's warrants were obtained by an unauthorized means and made payable to fictitious commercial payees for amounts in excess of $800,000 each." (*Richardson, supra*, at p. 858.) The *Richardson* court described the scheme, and its discovery, as follows: "On November 20, 1974, appellant, using the fictitious name 'Mr. Green,' gave four warrants to Morton Freeman whom he had met through Joyce Lewis. Freeman mailed the warrants to Richard Keates in New York. Although not part of the plan, Keates retained one warrant (counts 5 and 9) and ultimately it was successfully negotiated. Keates gave three of the warrants to Bernard Howard who in turn gave them to Michael Raymond. Approximately one week later, Raymond became an informant for the City of Los Angeles and negotiated a 'reward' for returning the three remaining warrants to the city." (*Id.* at p. 858.)

Relying on *Bailey*, the *Richardson* court reversed three of the defendant's four convictions for attempted grand theft, holding that the evidence in the

record established as a matter of law that the defendant had a single objective, i.e., to steal more than $3.2 million from the city. (*Richardson, supra*, 83 Cal.App.3d at p. 866.) "That four separate warrants were the means by which this end was to be achieved does not 'splinter' the crime into four separate offenses," since the evidence showed that the defendant gave all four warrants to the same individual on the same date to precipitate the unified scheme that was carried out by other individuals. (*Ibid.*)

In *People v. Packard* (1982) 131 Cal.App.3d 622 [182 Cal.Rptr. 576] (*Packard*), the defendant, an employee of Paramount Studios, formed a company and submitted false invoices on behalf of the company to bill the studio for the reproduction of nonexistent scripts. (*Id.* at p. 625.) The studio issued checks to the company several times per month. Each payment was usually several thousand dollars. (*Ibid.*) Over the course of three years, the studio paid the defendant's company more than $472,000. (*Ibid.*) After a bench trial, the defendant was convicted of three counts of grand theft. (*Ibid.*) Count one was based on invoices submitted " 'on or about the year 1976,' " while counts two and three were based on invoices submitted in the years of 1977 and 1978, respectively. (*Id.* at p. 626.)

On appeal, citing *Bailey*, the defendant maintained that he was guilty of only one count of grand theft, as a matter of law. The defendant argued that "the only reasonable conclusion supported by the evidence is that all the takings were pursuant to one general intent and scheme," and that there was no reasonable basis to conclude that he had "three separate schemes, each based neatly on calendar years [as charged], as distinguished from either one general scheme or a separate theft for each invoice and payment." (*Packard, supra*, 131 Cal.App.3d at p. 626.)

In reversing two of the defendant's three grand theft convictions, the *Packard* court noted that the People did not contend on appeal that there was a factual basis from which one could infer that the defendant had three separate yearly schemes. (*Packard, supra*, 131 Cal.App.3d at p. 627.) In concluding that the defendant was guilty of only one count of grand theft as a matter of law, the *Packard* court reasoned, "In the absence of any evidence from which it could reasonably be inferred that [the defendant] had three separate intents and plans, the only reasonable conclusion supported by the record is that [the defendant] had a single continuing plan or scheme for stealing money from Paramount." (*Ibid.*)

In *People v. Kronemyer* (1987) 189 Cal.App.3d 314, 324, 364 [234 Cal.Rptr. 442] (*Kronemyer*), the defendant, an attorney, formed a plan to steal all of the assets of his client's estate while acting as the client's conservator. A jury found the defendant guilty of numerous offenses, including four counts

of grand theft premised on the defendant's four withdrawals from the client's savings account "over a four-day period." (*Id.* at p. 363.) The *Kronemyer* court reversed all but one of these grand theft convictions, reasoning as follows. "The People's theory of the case at trial was similar to that in *People* v. *Richardson, supra,* 83 Cal.App.3d 853. They argued Kronemyer formed his intent to steal the assets of [his client's] estate before [his client's] June 1977 illness. They alleged, and the facts show, the plan included unlawfully taking all the savings accounts assets. The fact these physically separated funds required four transactions does not avoid the single-plan single-offense rule discussed in *People* v. *Bailey, supra,* 55 Cal.2d 514. [Citation.] On the facts of this case, only a single conviction for the takings described in counts five through eight is warranted. We therefore affirm count five and reverse counts six, seven and eight." (*Id.* at p. 364.)

Courts in a number of other cases have applied *Bailey* in considering whether a defendant may be convicted of more than one count of grand theft. (See, e.g., *People v. Tabb* (2009) 170 Cal.App.4th 1142, 1148 [88 Cal.Rptr.3d 789] (*Tabb*) [concluding that defendant could not remain convicted of multiple theft offenses in light of jury finding that defendant committed thefts pursuant to a " 'single, overall plan or objective' "]; *People v. Brooks* (1985) 166 Cal.App.3d 24, 31 [210 Cal.Rptr. 90] (*Brooks*) [reversing 13 of 14 counts of grand theft stemming from defendant's theft of auction proceeds because "the instant thefts from a single fund arising from a single auction, when seen in the light of the prosecution's own theory of a common scheme of 'kiting' auction proceeds, were the product of a general intent or overall plan, with but a single ultimate object"]; *People v. Gardner* (1979) 90 Cal.App.3d 42, 48 [153 Cal.Rptr. 160] (*Gardner*) [reversing three of four counts of grand theft of an animal carcass because defendant acted pursuant to "single purpose and objective of wrongfully removing the hogs slain during the brief hunting episode," and stating that "the felonious act of taking carcasses constitut[ed] the gravamen of the crime as an integral part of the 'whole plan' "]; cf. *In re Arthur V.* (2008) 166 Cal.App.4th 61, 69 [82 Cal.Rptr.3d 148] (*Arthur V.*) [applying *Bailey* to conclude that the prosecutor was permitted to aggregate the value of the damage caused by juvenile to reach the $400 figure required for a felony vandalism conviction because jury could have reasonably concluded that juvenile acted pursuant to a single objective in light of the fact that "[t]he damage to the windshield and cell phone occurred within a very brief time period, in the same approximate location, and constituted the victimization of the same person"].)

2.  *Standard of review*

Whether multiple takings are committed pursuant to one intention, one general impulse, and one plan is a question of fact for the jury based on the

particular circumstances of each case. (*Bailey, supra,* 55 Cal.2d at p. 519; *Packard, supra,* 131 Cal.App.3d at pp. 626–627; see also *Arthur V., supra,* 166 Cal.App.4th at p. 69.) As with all factual questions, on appeal we must review the record to determine whether there is substantial evidence to support a finding that the defendant harbored multiple objectives. (Cf. *Tabb, supra,* 170 Cal.App.4th at pp. 1149–1150; *Arthur V., supra,* 166 Cal.App.4th at p. 69.) The *Bailey* doctrine applies as a matter of law only in the absence of any evidence from which the jury could have reasonably inferred that the defendant acted pursuant to more than one intention, one general impulse, or one plan. (See *Packard, supra,* 131 Cal.App.3d at p. 627.)[10]

### 3. *Application*

■ In applying *Bailey* and its progeny, we begin by emphasizing that *Bailey* prohibits multiple theft convictions where the defendant commits a series of thefts pursuant to a *single* intention. (*Bailey, supra,* 55 Cal.2d at p. 519 [precluding multiple convictions where the defendant acts pursuant to "*one* intention, *one* general impulse, and *one* plan" (italics added)].) However, *Bailey* does not prohibit multiple convictions where the defendant commits a series of thefts based on *separate* intents, even if the defendant acts pursuant to the *same* intent on each occasion. (*Ibid.* [in determining whether one or multiple theft offenses have been committed, the question is "whether the evidence discloses one general intent or separate and distinct intents"].) We also are mindful that "intent . . . is rarely susceptible of direct proof and generally must be established by circumstantial evidence and the reasonable inferences to which it gives rise." (*People v. Buckley* (1986) 183 Cal.App.3d 489, 494–495 [228 Cal.Rptr. 128].)

We distill from the cases that have followed *Bailey* that the following types of evidence are relevant in determining whether a defendant acted pursuant to a single intent in committing a series of thefts: whether the defendant acted pursuant to a plot or scheme (e.g., *Richardson, supra,* 83 Cal.App.3d at p. 858 [discussing "scheme" to steal city's money]; *Brooks, supra,* 166 Cal.App.3d at p. 31 [convictions stemmed from "a common scheme" to steal auction proceeds]); whether the defendant stole a defined sum of money or particular items of property (e.g., *Kronemyer, supra,* 189 Cal.App.3d at p. 364 ["plan included unlawfully taking all the savings accounts assets"]);[11] whether the

---

[10] The question whether Jaska acted pursuant to "one intention, one general impulse, and one plan" (*Bailey, supra,* 55 Cal.2d at p. 519) was not expressly submitted to the jury in this case.

[11] Witkin describes this type of evidence as the genesis for the *Bailey* rule: "The courts early developed the rule that when an overall plan or single intent was formed to commit larceny of a certain sum of money or items of property, whether belonging to the same or different owners, the crime was a single offense of grand theft. The theory was that the defendant

defendant committed the thefts in a short timespan (e.g., *Gardner, supra,* 90 Cal.App.3d at p. 48 [convictions all stemmed from carcasses stolen during single hunting trip]) and/or in a similar location (*Arthur V., supra,* 166 Cal.App.4th at p. 69 [acts occurred "within a very brief time period, in the same approximate location"]); and perhaps most significantly, whether the defendant employed a single method to commit the thefts (e.g., *Packard, supra,* 131 Cal.App.3d at p. 625 [defendant repeatedly defrauded company by submitting phony invoices]).

In this case, all of these factors support the conclusion that Jaska has not demonstrated, as a matter of law, that the only reasonable conclusion that the jury could have drawn was that she acted pursuant to one intention, one general impulse, and one plan. Unlike *Richardson* and *Kronemyer,* there was no evidence in this case that Jaska acted pursuant to a plan or scheme to steal a defined set of BTP's assets. Rather, the evidence suggests that Jaska stole various sums of money in an opportunistic manner, essentially whenever the need and/or occasion arose. Unlike in *Gardner* and *Arthur V.,* Jaska did not commit the charged thefts over a short timespan. Rather, there is substantial evidence in the record that Jaska committed numerous fraudulent acts over a four-year period. Finally, and most significantly, in most of the cases in which courts have concluded that a defendant may be convicted of only a single count of grand theft, the defendants have engaged in the same conduct and in the same manner, although on multiple occasions. In this case, in contrast, Jaska employed a variety of distinct methods to steal from BTP. She improperly withdrew money from the petty cash account, used company funds to pay her personal American Express and Visa credit card accounts, took unauthorized pay and reimbursement, and used BTP's funds to make the monthly lease payments on the Volvo. The five counts reflect the many ways in which Jaska abused her position of trust to embezzle money from BTP.

█ Under these circumstances, we conclude that Jaska has not demonstrated that she had only one intent as a matter of law, because there is substantial evidence from which the jury could have reasonably inferred that Jaska did not commit all of charged thefts pursuant to "one intention, one general impulse, and one plan." (*Bailey, supra,* 55 Cal.2d at p. 519.) Accordingly, we reject Jaska's contention that her convictions on all but one of the counts of grand theft by embezzlement (counts 1–5) must be reversed.

B.–F.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

obtained possession of the desired money or property by unlawful means, and the defendant's guilt was determined by that fact and not by the methods employed." (2 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Crimes Against Property, § 12, p. 30.)

*See footnote, *ante,* page 971.

## IV.

## DISPOSITION

The judgment is reversed to the extent that it fails to award Jaska presentence custody credits under the amended version of section 4019. In all other respects, the judgment is affirmed.

The matter is remanded to the trial court for a determination of any additional presentence credits to which Jaska may be entitled pursuant to this opinion. The trial court is instructed to prepare an amended abstract of judgment to reflect any additional custody credits awarded, as well as the $300,000 fine and $499,999 restitution order. The court is directed to file the amended abstract of judgment with California's Department of Corrections and Rehabilitation.

McDonald, J., concurred.

**BENKE, Acting P. J.,** Concurring and Dissenting.—[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

On May 6, 2011, the opinion was modified to read as printed above.

---

[*]See footnote, *ante,* page 971.