Filed 2/25/14  P. v. Kidde CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D063849 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD236834) |
| GRAHAM WELSH KIDDE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Amalia L. Meza, Judge.  Affirmed.

John L. Staley, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Charles C. Ragland, Deputy Attorney General, for Plaintiff and Respondent.

Graham Kidde appeals from a judgment convicting him of two counts of grand theft arising from his participation in a fraudulent eBay sales scheme. He asserts the record does not support that he was aware of the fraudulent scheme and hence he cannot properly be convicted of theft. Alternatively, he argues that as a matter of law he committed only one grand theft because he was acting pursuant to a single overall scheme. We reject these contentions and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

The fraudulent eBay scheme in this case involved a " 'spoofing' " operation in which the seller placed an ad on eBay to sell a vehicle, and once a buyer was secured, the buyer was directed to a fake eBay invoice page. The invoice page gave the buyer the option of paying for the vehicle through a purported eBay escrow agent, who would hold the money for the seller until the vehicle was delivered to the buyer. In fact, there was no vehicle for sale and no such thing as an eBay escrow agent. The defrauded buyers wired money to a bank account belonging to the purported escrow agent, but never received the vehicle or a return of the money.

Defendant served as the purported eBay agent in these fraudulent transactions. Thomas Hutchings, an eBay fraud investigator, explained that in this type of fraud scheme a person known as a "money mule" acts as a conduit for the transfer of the money between the buyer and the seller. Money mules are typically solicited in work-from-home advertisements that offer a person a percentage of the money received in the transaction in exchange for the person's receipt of the money in his or her bank account, followed by the transfer of the money to another location, often to a foreign bank.

Defendant was charged with four counts of grand theft based on four fraudulent eBay transactions during the month of August 2010 involving advertisements to sell a car or motorcycle. Defendant did not directly communicate with the victims, but the victims were instructed to wire the money to his bank accounts. After receiving the money, defendant transferred the money to accounts in Hungary. Defendant did not deny serving as the conduit for the money sent by the victims but claimed he thought the transactions were legitimate. The jury found him not guilty for the first two incidents, and guilty for the third and fourth incidents.

*The Four Charged Incidents*

The first two incidents (of which defendant was acquitted) occurred on or about August 2 and 3, 2010. In the first incident, Imran Iqbal attempted to purchase a BMW car on eBay. After an online chat with a "live agent" who he believed worked for eBay, he wired $8,009 to defendant's account at Chase Bank in San Diego. He became suspicious; discovered from a BMW dealership that the vehicle's VIN number was not legitimate; contacted the seller and Chase Bank in an unsuccessful attempt to get his money back; and learned the transaction was a scam.

In the second incident, Terry Juntti attempted to purchase a 1967 Ford Mustang from eBay. Juntti wired $8,060 to defendant's San Diego bank account, thinking defendant was an escrow agent who would hold the money until the car was received. Juntti later learned there was no such thing as an eBay escrow agent; there was no car for sale; he had been directed to a fraudulent eBay site; and he could not get his money back.

3

The third and fourth incidents (of which defendant was convicted) occurred on or about August 5 and August 18, 2010. In the third incident, Carl Power attempted to purchase a motorcycle on eBay. He wired more than $950 to defendant's bank account at Chase Bank in San Diego, thinking defendant was an eBay representative. He never received the motorcycle.[1]

In the fourth incident, Jonathan Nagel attempted to purchase a 1955 Chevrolet vehicle advertised on eBay. Nagel wired $9,000 from the carpet cleaning company where he worked to defendant's Wells Fargo account in San Diego. The car never arrived, and Nagel never got his money back. When Nagel spoke to Wells Fargo personnel, they told him they could not do anything but advised him to call the police because he was not the only person who had called about defendant's account. On September 13, 2010, defendant's account at Wells Fargo was closed by the bank's loss prevention department.

*The Investigation and Defendant's Claim of Innocence*

In August 2010, Desiree Braca, an investigator for the Department of Motor Vehicles (DMV), began investigating consumer complaints about the charged eBay scam. When she first received information about the use of defendant's bank account in Iqbal's incident, she thought defendant was a victim of identity theft because the account was open for such a short time. Braca called defendant in September 2010 and left him a message that he might be an identity theft victim. Defendant returned Braca's call and

---

[1]     Power was not available to testify at trial and the parties stipulated to the content of his testimony.

left her a message, but at some point his number was disconnected and, according to Braca, they never reached each other.[2]

As Braca's investigation continued, she no longer thought defendant was an identity theft victim. She was receiving additional complaints that involved wire transfers to defendant's accounts, and she thought if he truly was an identity theft victim he would have made additional efforts to contact her. Defendant had accounts at three different banks, and investigators noticed they were opened and closed within a short time period (about one month); they involved only two or three large deposits and transfers with no other activity; and large wired deposits were withdrawn the day of (or the day after) the deposits. Braca obtained a warrant to search defendant's residence.

While his residence was being searched, defendant agreed to speak with Braca. He also testified at trial, providing essentially the same information that he gave during the interview. Defendant said that he became involved in the operation after he contacted a company (KFP-Partners) who advertised on a website about at-home business opportunities. Defendant was told that KFP-Partners helped investors save money on the VAT (value added tax) in Europe by allowing them to first send money to agents rather than directly to Europe. The company hired people to work as transaction agents who, in exchange for a commission, received wired money from the investors and then wired the

_____

[2] Defendant claimed that he did eventually reach Braca by phone. Also, he explained that during this time period he was having financial problems, and his phone number was disconnected because he lost his home through foreclosure. Braca ultimately found defendant's address through updated information he provided to the DMV.

5

money to individuals in Europe. Defendant said he conducted an investigation and found out the VAT was an actual excise tax and he thought the enterprise was legitimate. Defendant's contact person at KFP-Partners was Klaus Bergstein, with whom he communicated primarily by e-mail. Bergstein informed defendant when he would receive the money and instructed him to send the money to different recipients in Europe. Defendant claimed he had no idea the company was operating a criminal enterprise.

Explaining why he had so many bank accounts, defendant stated that Bergstein kept telling him to close his accounts because there was an issue with the person who was wiring the money. Defendant said he opened and closed accounts at Citibank, Chase, Wells Fargo, and lastly, Bank of America.

Defendant stated he was first notified about a problem by Citibank's branch manager, who told him the sender of the money thought the transaction might be a fraud and wanted a refund. Defendant could not understand why the customer was raising a fraud claim because he assumed the customer knew the money was being sent through a "third-party mediator" to avoid the value added tax. When defendant contacted Bergstein about this, Bergstein told him the company's clients had been specifically told there were no refunds and all transactions were final; the company would take care of the situation; and defendant should close the Citibank account and go to another bank.

After opening the Chase account, defendant was again told by the bank that a sender complained of a possible fraud, and Bergstein again told defendant to close the account. Defendant testified that it seemed odd that he was being instructed to close bank accounts, but he complied because he was an employee of the company, he trusted his

6

employer, and he attributed the problem to the investors changing their minds about the investments.

Defendant said that after opening the Wells Fargo account, the bank manager told him that a sender of money had complained about possible fraudulent activity and the bank had to close his account. Defendant contacted Bergstein and told him this was "fishy"; there might be criminal activity; and he did not want any more of these problems. Bergstein assured him the complaint arose from a logistical matter; the enterprise was legitimate; and there would be no more problems.

Defendant said he opened the Bank of America account in reliance on Bergstein's assurances. However, when he attempted to collect the first wired money to send it to Europe, he learned the money had been returned to the customer; accordingly, he did not receive his commission from these funds. Bank of America informed him the wire transfers were part of a criminal operation involving fraudulent eBay ads for cars, and placed him on "ChexSystems" status which prevented him from opening accounts at any bank. According to defendant, this was the first time he learned about the fraudulent scheme. Defendant stated he told the bank he had no idea the fraud was occurring; he provided the bank with copies of his e-mail correspondence with Bergstein; and the bank concluded he was not part of the criminal activity and removed him from ChexSystems. Also, because Bank of America had shut his account down "on the very first wire" and Bergstein had not carried through on his assurances that there would be no further problems, he told Bergstein he did not want to continue with the wire transfers. During the interview with Braca, defendant acknowledged that he "should have known better"

7

given that he was "going from one bank account to another because [he] had to close accounts" and he was told that someone was complaining that there might be a fraudulent wire transfer.

On defendant's computer, the authorities found numerous e-mail exchanges between defendant and Bergstein about the wire transfers. In an e-mail sent by defendant on August 28, 2010, defendant asked Bergstein if he should close his Wells Fargo account after an anticipated wire was received; referred to the possibility that one of the buyers (apparently Nagel, the fourth-incident victim) might attempt to freeze his Wells Fargo account; asked if this would affect his other Wells Fargo accounts; and asked if Bergstein had received his Bank of America account information.[3] In an e-mail sent by defendant in November 2010, defendant stated he could no longer work with Bergstein because Bank of America had put him on ChexSystems, which prevented him from opening a bank account anywhere in the United States. In this e-mail exchange, defendant also described the fraudulent nature of the wire transfers, and suggested he did

---

[3]    Defendant's August 28 e-mail stated: " 'Did you get my Bank of America account information? I will be fine with the transfer on Tuesday at the Wells Fargo account, Klaus. Should I close that account after the wire is done? I have three other accounts at Wells Fargo. If this carpet guy goes after a formal freeze, does that freeze all accounts or just the one that I do the wires with?' "

8

not want to continue participating in fraudulent transactions.[4]

Based on their investigation, the authorities concluded defendant was a middleman in the fraudulent enterprise and he was aware he was involved in criminal activity. DMV investigator Braca testified that defendant's August 28 e-mail asking if he should close an account after receiving wired money suggested that he knew he had to close the account so the person who was wiring the money would not be able to get the money back. Also, eBay investigator Hutchings opined that although some money mules might think the transactions are legitimate, when a money mule engages in "bouncing"—i.e., opening and closing numerous different accounts to accomplish the money transfers—this would suggest he or she is aware of the fraudulent scheme.

---

4     Defendant's November 2010 e-mail stated: " 'I can't work with you because I have been put on the checks system by the last bank, Bank of America. That means I can't open any bank account anywhere in the United States because of the last wire. The wire is an eBay fraud wire which solicited a picture of a car from sales. The victim wired the money to someone like me. He, of course, wants the money back, henceforth the hasty instructions to get the cash the same day and then I must wire the stolen money to Budapest receivers. Even if I would be cleared somehow through a miracle off the checks systems, I wouldn't want to have . . . three canceled bank accounts and be put back on the checks system.' "

    In a responding e-mail, Bergstein stated: " 'That's totally true so we steal money, you got your part, a big one I think for what you did and now all they did to you is ban you from opening new accounts. I think it's worth [it], am I right, so why don't you do it again?' "

    Defendant answered, " 'It's worth it if I get off the ChexSystems, accept the wire[s] that are truly clean and not fraudulent. Of course how would I know if each and every wire could be a booby trap for the bank to cancel my account and possibly be put right back on the ChexSystems and have no way [of] [e]ver doing my personal banking which . . . i[s] very important to me. After all, Klaus, I have four bank accounts closed due to fraud. [Y]ou ask me why I wouldn't do it again? Interesting that you would even ask.' "

9

*Jury's Verdict and Sentence*

Defendant was charged with four counts of grand theft (Pen. Code, § 487, subd. (a)) on the theory that he aided and abetted or conspired to commit the offense of grand theft by false pretense. He was acquitted of counts 1 and 2 (victims Iqbal and Juntti, respectively) and convicted of counts 3 and 4 (victims Power and Nagel, respectively). The court sentenced him to 180 days in custody, stayed the sentence, and granted him probation.

## DISCUSSION

### I. *Sufficient Evidence of Knowledge*

Defendant argues there is insufficient evidence to support the finding that he knew the victims' money was being taken under false pretenses.

In reviewing a challenge to the sufficiency of the evidence, we examine the entire record in the light most favorable to the judgment to determine whether there is substantial evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Nelson* (2011) 51 Cal.4th 198, 210.) We presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence. (*Ibid.*) If the circumstances reasonably justify the jury's findings reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding. (*Ibid.*)

To be culpable for theft under aider and abettor or conspiracy principles, the defendant must know about and share the perpetrator's intent to defraud. (See *People v. Beeman* (1984) 35 Cal.3d 547, 560 [aiding and abetting requires knowledge of criminal

10

purpose and intent to commit or facilitate offense]; *People v. Prevost* (1998) 60 Cal.App.4th 1382, 1399 [conspiracy requires intent to agree and intent to commit offense]; *People v. Gentry* (1991) 234 Cal.App.3d 131, 138 [theft by false pretenses requires intent to defraud].) The courts recognize that evidence "of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction." (*People v. Bloom* (1989) 48 Cal.3d 1194, 1208.) Further, "[d]irect evidence of the mental state of the accused is rarely available except through his or her testimony. The trier of fact is and must be free to disbelieve the testimony and to infer that the truth is otherwise when such an inference is supported by circumstantial evidence regarding the actions of the accused." (*People v. Beeman, supra*, 35 Cal.3d at pp. 558-559.)

It appears from the acquittals on counts 1 and 2 that the jury deduced that defendant may have *initially* thought he was participating in legitimate transactions designed to avoid a tax payment for customers who sent money to his accounts. The guilty verdicts on counts 3 and 4 reflect that the jury determined that he subsequently figured out the transactions were fraudulent, but he continued participating. The record supports the jury's finding that defendant knew about the fraud.

The prosecution's evidence showed that defendant was repeatedly closing and opening bank accounts; victims were unable to get their money back when they contacted the banks; and in an August 28 e-mail to his employer defendant indicated that he knew a customer was seeking to freeze his Wells Fargo account, asked if he should close the Wells Fargo account after receiving a wire transfer, and asked if his Bank of America

11

information had been received. From this evidence, the jury could deduce that defendant knew that fraudulent activity was occurring because a customer was worried about a transfer to his Wells Fargo account; knew his employer had adopted a strategy of closing accounts after wire transfers to impede efforts by suspicious customers to retrieve their money; and notwithstanding this knowledge was continuing to engage in the transactions at different banks.

Defendant's statements to investigator Braca and at trial buttress the inference that defendant knew about the fraud. Defendant acknowledged that after he was told by Citibank about the suspicion of fraud, he moved on to participate in a transaction at Chase Bank, and after he again received a report of possible fraud from Chase Bank, he nevertheless moved on to participate in a transaction at Wells Fargo, and this pattern repeated again with Bank of America. The jury could reasonably infer that based on the complaints of suspected fraud and his employer's directives that he close accounts, defendant must have realized the transactions were illegitimate. The jury could also consider that, even under defendant's version of the events, he did not end his participation in the scheme until he lost a commission based on Bank of America's return of the money to the customer, and until Bank of America placed him under the ChexSystems which effectively precluded him from serving as a conduit for the money. The jury could assess from this evidence that notwithstanding reports of suspected fraud, defendant stopped participating in the transactions only when he was essentially forced to stop, and this reflected that he was not acting with an innocent state of mind.

12

To support his challenge to the sufficiency of the evidence, defendant points out that his August 28 e-mail suggesting he was aware of his employer's fraudulent scheme was not sent until after the last charged incident on August 18. The timing of the e-mail does not undermine the evidentiary support for the jury's verdict. The contents of the e-mail support that defendant was aware of the fraudulent nature of the transactions he had undertaken prior to sending the e-mail; i.e., he knew the customer involved in the August 18 wire transfer was seeking to freeze his account; he wanted to know if he should close an account; and he wanted to ensure his employer knew about his account at a different bank. The fact that this incriminating e-mail was sent after the last charged incident does not detract from its relevancy to show his guilty state of mind during the time period before he sent the e-mail.

Defendant's challenge to the sufficiency of the evidence fails.

## II. *Contention that Defendant Committed Only One Theft*

Defendant argues that as a matter of law he can be convicted of only one grand theft offense for counts 3 and 4 because the thefts from Power and Nagel were based on a single plan. In support, he relies on the *Bailey*[5] doctrine. In *Bailey*, the court evaluated whether the defendant committed one grand theft, or a series of petty thefts, based on her fraudulent procurement of several welfare checks which, when aggregated together, reached the amount necessary for grand theft. (*Bailey, supra*, 55 Cal.2d at pp. 515, 518.) The *Bailey* court set forth the general principle that grand theft, rather than multiple petty

---

[5] *People v. Bailey* (1961) 55 Cal.2d 514 (*Bailey*).

thefts, is committed when the takings were "motivated by one intention, one general impulse, and one plan . . . ." (*Id*. at p. 519.)

Although *Bailey* concerned aggregation of acts to support grand rather than petty theft, it also enunciated a test for determining whether *one grand theft*, rather than *multiple grand thefts*, was committed, stating:  "Whether a series of wrongful acts constitutes a single offense or multiple offenses depends upon the facts of each case, and a defendant may be properly convicted upon separate counts charging *grand theft from the same person* if the evidence shows that the offenses are separate and distinct and were not committed pursuant to one intention, one general impulse, and one plan." (*Bailey, supra*, 55 Cal.2d at p. 519, italics added.)  The facts and analysis in *Bailey* concerned multiple takings from the *same victim*.  Based on *Bailey*, numerous courts have applied the one-plan/one-offense standard to determine whether a series of takings from a single victim could support only a single grand theft conviction.  (See, e.g., *People v. Packard* (1982) 131 Cal.App.3d 622, 625-627; *People v. Kronemyer* (1987) 189 Cal.App.3d 314, 363-364; *People v. Jaska* (2011) 194 Cal.App.4th 971, 981-985; see also *People v. Tabb* (2009) 170 Cal.App.4th 1142, 1148-1150; *In re David D*. (1997) 52 Cal.App.4th 304, 309-310.)[6]

In contrast, when (as here) *multiple victims* were involved, the fact that the takings were pursuant to a single design is not determinative.  Rather, the courts have reasoned

---

[6]     The California Supreme Court has granted review of a case holding that theft from the same victim through separate transactions can support multiple theft convictions even if the defendant acted pursuant to a single overall scheme.  (*People v. Whitmer* (2013) 213 Cal.App.4th 122, review granted May 1, 2013 (S208843).)

that if the takings from different victims occurred on *multiple occasions*, multiple convictions are appropriate even if the takings were pursuant to one overall plan. (*People v. Garcia* (1990) 224 Cal.App.3d 297, 307-308 [four grand theft convictions warranted based on thefts committed on different dates and involving different victims, even though thefts were pursuant to single scheme]; see *People v. Mitchell* (2008) 164 Cal.App.4th 442, 456 ["A defendant who steals from multiple victims over a lengthy crime spree may have a single objective of obtaining as much money or property as possible. However, he has still committed multiple offenses."].) On the other hand, if the multiple takings from multiple property owners occurred on a *single occasion*, the courts have found a single conviction is proper. (*People v. Smith* (1945) 26 Cal.2d 854, 858-859 ["theft of several articles at one and the same time constitutes but one offense although such articles belong to several different owners"]; *People v. Brooks* (1985) 166 Cal.App.3d 24, 27-28, 30-31 [only one grand theft conviction warranted based on theft occurring at single auction, even though property was stolen from multiple victims]; *People v. Lyons* (1958) 50 Cal.2d 245, 275 [only one offense of receiving stolen property occurred for property received on a single occasion, even though goods were stolen from different sources]; see *In re Arthur V*. (2008) 166 Cal.App.4th 61, 68-69 & fn. 4.)

The question of whether a defendant has committed a series of independent thefts or one overall theft is generally a question of fact. (*People v. Jaska, supra*, 194 Cal.App.4th at pp. 983-984; see *People v. Tabb, supra*, 170 Cal.App.4th at p. 1149; *People v. Sullivan* (1978) 80 Cal.App.3d 16, 21.) The question may be resolved as a

matter of law if the evidence can support only one reasonable conclusion. (*People v. Packard, supra*, 131 Cal.App.3d at p. 627; *People v. Jaska, supra*, at p. 984.)[7]

The record does not show as a matter of law that defendant committed only one theft for counts 3 and 4. Rather, the evidence supports distinct convictions given that the two counts involved a different victim, date of occurrence, and bank. Count 3 concerned a taking from Power via a transfer to Chase Bank, and count 4 concerned a taking from Nagel several weeks later via a transfer to Wells Fargo. Although the takings were accomplished as part of the same overall eBay fraud scheme, a conviction for each count was proper based on the multiple victims and separate transactions.

## DISPOSITION

The judgment is affirmed.

 

 

HALLER, J.

WE CONCUR:

HUFFMAN, Acting P. J.

McDONALD, J.

---

7    The jury was not instructed that it should decide whether defendant committed a single theft or multiple thefts. (See *People v. Sullivan, supra*, 80 Cal.App.3d at p. 19.) Defendant raises no claim of error based on the instructions; accordingly, we need not discuss this issue. (See *People v. Jaska, supra*, 194 Cal.App.4th at p. 984, fn. 10.)