Filed 3/22/24  P. v. Chapman CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>GREGORY T. CHAPMAN,<br><br>　　Defendant and Appellant. | B303437<br><br>(Los Angeles County<br>Super. Ct. No. BA425361) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Curtis B. Rappe, Judge.  Affirmed in part, sentence is reversed, vacated and remanded with instructions.

Valerie G. Wass for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Michael C. Keller and Charles S. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

————————————————

# INTRODUCTION

From 2003 to 2011 Gregory Chapman and his associates offered securities in their company, Authotecq. Authotecq held itself out as having a successful credit card technology, and Chapman personally authored materials selling investments in the company that predicted hundreds of millions of dollars in expected revenue. Authotecq attracted $11 million in investments from individual investors. But investors did not know Authotecq sold securities in violation of state law, actually earned no revenue, never fully developed its technology, and misappropriated almost all investor funds.

For his role in Authotecq, Chapman was convicted by a jury of 69 counts of securities fraud (Corp. Code, § 25401, subd. (b)), 68 counts of grand theft (Pen. Code, § 487, subd. (a)), and one count of participating in a fraudulent securities scheme (Corp. Code, § 25541).[1] He was sentenced to a total of 30 years.

Chapman raises 10 errors on appeal. While we reject Chapman's challenges to his conviction, we remand for resentencing. Chapman is entitled to the benefit of newly amended sections 654 and 1170, subdivision (b), as well as a stay of his sentence on the fraudulent securities scheme count under section 654. We also direct the trial court to modify the sentencing minute orders and the abstract of judgment to correct certain errors. Accordingly, the judgment of conviction is affirmed, but the sentence is reversed, vacated, and remanded to the trial court.

---

[1] Undesignated statutory references are to the Penal Code.

# FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Information*

On November 22, 2016 Chapman was charged by information with 74 counts of grand theft (§ 487, subd. (a)), 74 counts of securities fraud (Corp. Code, § 25401, subd. (b)), and one count of participating in a fraudulent securities scheme (Corp. Code, § 25541).  The information charged codefendants Rogel Patawaran and James Litzinger with the same counts.  The information included three special allegations as to all counts:  (1) the defendants committed two or more related felonies with the material element of fraud, involving a pattern of related felony conduct and the taking of more than $500,000 (§ 186.11, subd. (a)(2)); (2) the defendants intentionally took funds exceeding $100,000 (§ 1203.045, subd. (a)); and (3) the defendants, in the commission of a felony, intentionally took property in an amount exceeding $1,300,000 (§ 12022.6, subds. (a)(3), (b)).

Litzinger pleaded guilty to two counts and the first special allegation, receiving an eight-year prison sentence.  Chapman and Patawaran pleaded not guilty and were tried together.

B.    *The People's Evidence at Trial*

1.    *Chapman, Patawaran, and Litzinger Formed Authotecq*

In the 1990s Chapman, Patawaran, and Litzinger met and founded a data security company, RGTecq.  They hired salesman Wallace Thomas to raise investments for RGTecq on a 30 to 35 percent commission.  Chapman was in charge of preparing RGTecq's "private placement memoranda," or "PPMs":

documents soliciting funds from investors by explaining how investments will be used and projecting the company's future revenue. RGTecq eventually shut down after being unable to pay its rent and its employees. Dozens of investors in RGTecq received no return on their investment.

In 2001 or 2002 Chapman and Patawaran decided to launch a new company, Authotecq, focused on credit card processing technology. Litzinger served as Authotecq's president. Thomas joined Authotecq as a salesperson in charge of raising investment funds, marketing the technology, and keeping in contact with investors. Thomas hired another salesman, Michael Diaz, to help recruit investors.

2. *Authotecq Sold "Stock" to Investors, Then Diverted Investor Funds*

Thomas and Diaz cold-called potential investors to offer stock in Authotecq, although Authotecq was not qualified to sell securities and neither Thomas nor Diaz were licensed to sell securities in California. Thomas falsely told would-be investors that merchants were already processing credit card transactions through Authotecq and Authotecq was earning revenue from these merchants. Thomas also falsely told potential investors their funds were invested directly into the company. In reality, Thomas and Diaz kept 45 percent of the funds raised as their commission.

Once Thomas and Diaz identified potential investors, Litzinger mailed them an investment package, including a PPM, and Thomas or Diaz would follow up to execute the deal. Each investor received an Authotecq stock certificate. No investors received any return on their investment.

4

The information filed against Chapman focused on fraudulent sales of stock to nine named victims, many retired. The victims testified to repeated contact from Thomas and Diaz providing updates on Authotecq's purported finances and progress to solicit continued investments.

Duane Anderson, a retired financial analyst, bought stock in Authotecq on 13 occasions between 2005 and 2010 for approximately $90,000.

Chuck Mills, also retired, invested six times in Authotecq in 2010 and 2011. Mills invested $92,500.

Richard Joyce, an optometrist, bought stock in Authotecq 12 times from 2003 to 2011. All told, Joyce invested $85,000.

Guyla Etter first invested in Authotecq in 2004. Through 2010, Etter made five more investments for a sum of $55,000.

Mary Jane Ludwig invested $100,000 from her retirement account in 2007.

Gary Ruchaber invested 11 times from 2007 to 2011. Ruchaber's investments totaled $430,000.

Kenneth Hoagland, a retired sales manager, invested $940,000 between 2008 and 2011 in 15 separate investments.

John Orlando, a retired teacher, invested twice in 2010 for a total of $15,000.

Joe Baker, a retired dentist, also invested a total of $15,000 over two occasions in 2010.

Authotecq received $11,461,117.50 in investor funds and generated zero revenue from its product. The investor funds were diverted into various shell companies owned by Chapman, Chapman's son, Patawaran, Litzinger, and others. Chapman and his son personally received over $1.4 million in Authotecq investor funds through Chapman's company IQSecure and over

5

$2 million in investor funds through Chapman's company Shadoworks. Chapman spent more than $1.8 million of investor funds on personal expenses for "automobiles, household repairs, medical visits, residential leases, and restaurant and entertainment expenses."

3.      *Authotecq Misrepresented Its Product*

Unbeknownst to investors, Authotecq's credit card processing technology was not viable. In 2008 Authotecq purchased a preexisting credit card gateway company, Valetpay, and renamed it Paysentinel.[2] Only seven merchants used Paysentinel, and even then, only occasionally. The gateway could not process debit cards, merchants could not sign up to use the gateway online, and the gateway could not bill merchants for transactions. When Paysentinel sought security certification in 2009, the security assessor observed the gateway had only ever processed 20 to 25 credit card transactions, and there was no current traffic on the gateway—as compared to the typical gateway traffic of 300,000 to 400,000 credit card transactions per month.

Authotecq did not use its investor funds to address these deficiencies or to improve its product. After Authotecq purchased Paysentinel, the sole software developer working on the product was not paid regularly. After discussing the nonpayment with Chapman, the software developer worked only 15 hours a week and received payment up front. Paysentinel's CEO, who

---

[2]      A credit card gateway enables a credit card transaction by connecting a "particular merchant's network" and "the Visa or MasterCard network, depending on what type of [credit] card" is used. Paysentinel was advertised as an "e-commerce gateway."

Chapman hired to develop the gateway for the market, was also paid irregularly and lacked the budget to effectively market the product.

    4.    *Chapman's Role in Authotecq*

Litzinger testified that early into the Authotecq venture Chapman prepared a written list of Chapman's duties. In the document, Chapman claimed ownership of the business side of Authotecq: interviewing and hiring employees, researching information to include in Authotecq PPMs, preparing financial charts and graphs for the PPMs, dealing with shareholders, raising money, and naming new products, subsidiaries, and services. As summarized by Chapman: "Basically no one moves or really does anything unless I do it first." Chapman was identified as "Chairman of the Board of Directors" in some of Authotecq's corporate filings with the Delaware Secretary of State.

Thomas testified Chapman prepared all offering materials for Authotecq, including the PPMs, the initial investor subscription package, and subsequent investor updates and talking points. PPMs were issued in May 2003, May 2005, May 2007, August 2009, January 2010, August 2010, November 2011, and February 2012. Although the PPMs generally explained Authotecq's "Use of Proceeds" from investments, they did not disclose any sales commissions paid to Thomas and Diaz until the company's final PPM in 2012, which disclosed a 5 percent sales commission. Each PPM stated large fundraising goals, ranging from $2.5 million to $5 million, and reflected that almost all investor funds would be reinvested into Authotecq. The PPMs also reported "projected gross revenue." For instance, the 2003

PPM asserted zero revenue in 2003 but predicted $71,641,250 in revenue by 2008; the 2007 PPM projected 2008's revenue at $162,000 and revenue in 2013 at $162,000,000; and the 2012 PPM estimated revenue at $3,166,560 by 2013 and $395,820,000 by 2017.

Litzinger testified Chapman told him the projected income statements in the PPMs were "just made up, because all businesses do it that way." Litzinger eventually raised concerns over the accuracy of the information in the PPMs, but did not know if Chapman ever corrected the false information or added missing material information to the documents. Chapman's name did not appear on the PPMs he authored, except for the May 2005 PPM, which identified Chapman as "Senior Marketing Consultant and Chairman of the Board" and "Business Development Consultant (Co-Chairman of Authotecq)."

Chapman also exercised control over Authotecq funds. Chapman, along with Patawaran and Litzinger, approved Thomas' and Diaz's 45 percent commission fee. He was a signatory on one of Authotecq's bank accounts. Chapman also received Authotecq funds through his other companies, Shadoworks and IQSecure. The funds Chapman received from Authotecq's accounts were meant for Chapman's own salary and other employees' salaries. But Chapman did not regularly pay other employees' salaries, and admitted to one unpaid employee that he had been using Authotecq funds for his son.

Chapman was further involved in covering up the illegality of the scheme. Chapman and Patawaran advised Thomas that, although neither Thomas nor Diaz were licensed to sell securities in California, they could solicit and refer investors to Litzinger. Chapman and Patawaran asserted that Litzinger could sell

unregistered stock in Authotecq as its president. Chapman, Patawaran, and Litzinger also told Thomas that merchants were already using their technology to process transactions, earning revenue for Authotecq, and that Authotecq was likely to be sold to another company for billions of dollars. Chapman specifically instructed Litzinger to tell investors that the company would be bought out, go public, repay investors from company dividends, or buy back the investors' stock at a profit.

5. *The Department of Corporations Issues Authotecq a Desist and Refrain Order in 2006*

In 2006 the Department of Corporations[3] (DOC) received information that Authotecq was offering securities to investors but was not qualified under state law to do so. The investigation was handled by Michelle Lipton, a senior corporations counsel in the DOC's enforcement division. Lipton verified the report and prepared a desist and refrain order (DRO) against Authotecq for violating Corporations Code section 25110.

The California Corporations Commissioner issued the DRO on January 4, 2006 and served the DRO on Authotecq on January 10. The DRO stated Authotecq, Litzinger, and Diaz "are hereby ordered to desist and refrain from the further offer or sale in the State of California of securities, including, but not limited to preferred stock, unless and until qualification has been made under said law." The DRO was published online to protect potential investors.

---

[3]     Now known as the Department of Business Oversight.

9

After the DRO was issued, Authotecq continued to sell unqualified stock to investors until March 2012. Chapman, Litzinger, and Patawaran informed Thomas of the DRO, but they explained it resulted from a "clerical" or "paperwork" error. They instructed Thomas to keep selling to investors; when asked, Thomas told investors the DRO only concerned a clerical error. Patawaran later advised Diaz to use an alias (Ken Phillips) when selling investments to protect Authotecq.

6. *The 2010 to 2012 Department of Corporations and United States Department of Justice Investigation*

On March 4, 2010 the DOC received a tip about Authotecq through the National Telemarketing Victim Call Center (NTVCC), a nonprofit. The tip came from Benedict Cartwright, who worked with the NTVCC, and contained a letter from Cartwright, the 2009 Authotecq PPM, an Authotecq letter to investors, and a copy of the DRO. Cartwright wrote:

"Enclosed is a packet that I received this past week along with several phone calls trying to get me to invest in AUTHOTECQ SYSTEMS, INC. Also enclosed is a copy of the DESIST AND REFRAIN ORDER from the California Department of Corporations. In addition to that Ken Phillips who was also involved with First Frame Pictures is recommending the offer to me.

I will be sending you a packet on First Frame Pictures as soon as I get it copied. I am sending you this one first because I might protect someone else

10

from being take [sic] to the cleaners if it proves to be fraud."

Lipton investigated Cartwright's complaint against Authotecq. Lipton contacted Cartwright and learned Cartwright was called by an Authotecq salesman and given Authotecq PPMs, but he had not invested in the company. Cartwright was unable to remember any further information about his conversation with the Authotecq salesman because he regularly received many such phone calls as an employee of the NTVCC. Lipton testified at trial that, after following up with Cartwright, she lacked evidence "to move forward" with investigating Authotecq.

On January 18, 2011 the NTVCC sent the DOC another tip regarding Authotecq. This tip originated with Roger Verly, an Authotecq investor. Lipton also contacted Verly, who confirmed he had invested over $100,000 in Authotecq after receiving an unsolicited phone call. Despite his complaint, Verly did not want to cooperate with any investigation into Authotecq.

Lipton was able to determine, however, that Verly's investment had been deposited into an account with City National Bank. Lipton subpoenaed the bank records for the account, which led to a list of potential investors who had deposited money into the account. Lipton followed up with these potential investors, many of whom were reluctant to cooperate.

Lipton's investigation resulted in a civil enforcement action against Authotecq in March 2012. In April 2012, the matter was referred to the U.S. Department of Justice, Special Crimes Unit. As a result of that investigation, a warrant for Chapman's arrest was issued on January 8, 2015.

C.    *Chapman's Trial Defense*

Chapman testified in his own defense.  Chapman asserted he had run successful companies in the past and was merely a consultant for Authotecq.  He testified he did not write any PPMs for RGTecq or Authotecq.  Instead, an attorney prepared the documents and he never reviewed them.  Chapman denied hiring Thomas for Authotecq, and he denied meeting or speaking to Diaz entirely.  He further denied knowledge of or involvement in the 45 to 50 percent commissions Authotecq paid to Thomas.  As to Authotecq funds sent to Chapman's alleged shell companies, Chapman explained Authotecq paid Shadoworks for marketing materials to merchants and the right to license the credit card processing technology Chapman and Patawaran owned.

D.    *Chapman's Convictions and Sentence*

After a nine-week trial, the jury convicted Chapman on all counts and found the special allegations true.[4]

In December 2019 the court sentenced Chapman to a total sentence of 30 years.  This sentence was composed of the upper term of five years on count 102 for securities fraud, the base count.  The court added consecutive one-year sentences for 24 of the remaining securities fraud counts, and a consecutive one-year sentence on count 270, relating to selling securities using a fraudulent scheme.  The court imposed concurrent one-year sentences on the remaining securities fraud counts.  As to the

---

[4]    During trial, the trial court dismissed counts 57 to 70 on the People's motion because the victim on those counts was unavailable to testify.  After the verdict, the trial court dismissed count 123 because the jury did not sign and date the verdict form as to that count.

grand theft counts, the court imposed the middle term of two years on each count, but stayed the sentences pursuant to section 654. On the enhancements, the court imposed and stayed the upper term of five years on the section 186.11 enhancement, and it dismissed the section 12022.6, subdivision (a), enhancement in the interests of justice. The court ordered restitution of $5,291,773.38.

Chapman timely appealed.

## DISCUSSION

On appeal, Chapman raises 10 claims of error. As to his convictions, Chapman argues: (1) the statute of limitations barred his prosecution as a matter of law; (2) the jury was improperly instructed on the statute of limitations and evidence of an uncharged conspiracy; (3) his 63 grand theft convictions must be consolidated into one conviction under the doctrine articulated in *People v. Bailey* (1961) 55 Cal.2d 514 (*Bailey*); (4) the trial court failed to instruct on the *Bailey* doctrine; (5) the trial court failed to hold a second evidentiary hearing on allegations of juror misconduct; and (6) Chapman received ineffective assistance of counsel. Chapman also challenges his sentence, arguing: (7) the trial court was required to stay Chapman's sentence on count 270 under section 654; (8) remand is necessary for resentencing under newly enacted Assembly Bill No. 518, which amended section 654; and (9) he is entitled to resentencing under Senate Bill No. 567, which amended section 1170, subdivision (b). Finally, Chapman requests (10) correction of certain errors in the trial court's sentencing

13

minute orders and the abstract of judgment. We address each in turn.

A. *Statute of Limitations*

Chapman first argues he was prosecuted outside the applicable four-year statute of limitations because the DOC first discovered his criminal conduct through Cartwright's March 2010 complaint but the warrant for his arrest was issued in January 2015, four years and 10 months later.

1. *Legal Background and Standard of Review*

Chapman argues, the People concede, and we agree Chapman's prosecution for securities fraud (Corp. Code, § 25401), grand theft (Pen. Code, § 487, subd. (a)), and engaging in a fraudulent securities scheme (Corp. Code, § 25541) needed to commence "within four years after discovery of the commission of the offense." (Pen. Code, §§ 801.5, 803, subd. (c).) In this context, "discovery" of the offense is "not synonymous with actual knowledge" of the offense. (*People v. Zamora* (1976) 18 Cal.3d 538, 561-562 (*Zamora*).) Instead, the limitations period "is triggered when either the victim or a responsible law enforcement official learns of facts which, if investigated with reasonable diligence, would make that person aware a crime had occurred." (*People v. Rodriguez* (2021) 71 Cal.App.5th 921, 930 (*Rodriguez*).) "'The crucial determination is whether law enforcement authorities or the victim had actual notice of circumstances sufficient to make them suspicious of fraud thereby leading them to make inquiries which might have revealed the fraud.'" (*People v. Petronella* (2013) 218 Cal.App.4th 945, 957(*Petronella*).)

14

"The issue of when the fraud was discovered or could have been discovered through the exercise of reasonable diligence presents questions for the trier of fact to decide." (*Rodriguez*, *supra*, 71 Cal.App.5th at p. 930.) At trial, the prosecution bears the burden to prove by a preponderance of the evidence that the charges against the defendant were filed within the statute of limitations. (See *Zamora*, *supra*, 18 Cal.3d at p. 565, fn. 27.) "'When an issue involving the statute of limitations has been tried, we review the record to determine whether substantial evidence supports the findings of the trier of fact.'" (*Petronella*, *supra*, 218 Cal.App.4th at p. 957.) Substantial evidence is evidence that is "'reasonable, credible, and of solid value.'" (*People v. Xiong* (2013) 215 Cal.App.4th 1259, 1269.)

2. *Substantial Evidence Supported the Jury's Finding the Prosecution Against Chapman Commenced Within the Statute of Limitations*

In Chapman's case, the statute of limitations issue was submitted to the jury. In returning a general guilty verdict, the jury impliedly determined Chapman's prosecution was not barred by the statute of limitations because Lipton exercised reasonable diligence to discover the fraud through Verly's complaint on January 18, 2011. (See *Zamora, supra*, 18 Cal.3d at p. 565.)

Chapman argues there was insufficient evidence supporting the jury's implicit finding. Specifically, Chapman maintains "the evidence establishes the fraud was discovered on March 4, 2010, when DOC attorney Lipton received notice of possible fraud" from Cartwright. Chapman emphasizes that Lipton prepared the 2006 DRO against Authotecq, Cartwright's letter of complaint mentioned "fraud," and Authotecq's offering

15

materials attached to Cartwright's complaint did not mention the DRO. From this information, Chapman says, "a reasonable person in Lipton's position would have checked to see if the DRO was still in effect, and because it was, she would have immediately been placed on notice that persons on behalf of Authotecq were committing securities fraud by offering to sell securities in violation of the DRO and by omitting a material fact from their offering materials."

There is substantial evidence in the record supporting the jury's finding the DOC did not possess knowledge of circumstances sufficient to raise suspicion of fraud from Cartwright's complaint.[5] Upon receiving this complaint, Lipton duly contacted Cartwright to further investigate. Cartwright, however, was unable to provide any additional information about his conversation with Authotecq. Lipton testified her

---

[5] The People argue Cartwright's complaint did not convey suspicion of fraud because "Cartwright had not invested any money in Authotecq, and therefore had suffered no loss." The People rely on case law explaining "'discovery of a loss by the victim *alone* is insufficient to trigger the running of the limitations period'" because "'"discovery of a loss, without discovery of a criminal agency, is not enough."'" (*Petronella*, *supra*, 218 Cal.App.4th at p. 956.) Chapman responds that "it is not necessary for the law enforcement agency to be informed of an actual loss by a victim in order for the statute of limitations to begin running, as long as there is notice 'of facts sufficient to make a reasonably prudent person suspicious of fraud.'" We need not resolve this dispute because a completed offense proscribed by Corporations Code section 25401 does not require "monetary loss." (See *People v. Koenig* (2020) 58 Cal.App.5th 771, 798.) Therefore, in the context of section 25401, no loss is required to constitute a crime, much less to begin the statute of limitations.

16

conversation with Cartwright did not provide her with enough "to move forward" with the investigation.  Based on these facts, there was substantial evidence for the jury to find Lipton exercised "reasonable diligence" but lacked facts to suspect fraud even after following up with Cartwright.  (See *Rodriguez*, *supra*, 71 Cal.App.5th at p. 933 [holding there was substantial evidence that theft was not "discovered" where the victims investigated "financial discrepancies" but failed to identify crime because the court could not "consider the evidence and make a different inference about the outcome of [their] investigation"]; *Petronella*, *supra*, 218 Cal.App.4th at p. 957 [holding substantial evidence to find fraud was not discovered where auditors noticed "'huge red flag[s]'" but their supervisors determined the discrepancies were not "serious enough" to "follow up"].)

While Cartwright mentioned Authotecq's sales might "prove[] to be fraud," his complaint did not explain whether or how Authotecq disclosed the "material fact" of the DRO in its sales pitch, and thus did not, by itself, convey knowledge of circumstances creating suspicion of fraud in violation of Corporations Code section 25401.  (See Corp. Code, § 25401; cf. *People v. Crossman* (1989) 210 Cal.App.3d 476, 479, 482 (*Crossman*) [holding no discovery of theft when a neighbor reported seeing "defendant remove some boxes" from victim's home and "suspected defendant had taken the gold coins" because neighbor's statement was "nothing but speculation on which to suspect theft"].)

17

Chapman argues Lipton gained "sufficient knowledge that a crime had been committed" from Cartwright's complaint because, had she investigated whether the DRO against Authotecq was still active, she would have learned Authotecq was still selling securities in violation of Corporations Code section 25110.  Lipton testified, however, that the DRO she issued against Authotecq was unrelated to broader securities fraud, and therefore she did not have any "evidence of fraud or additional wrongdoing" to warrant further investigation.  (See *Crossman*, *supra*, 210 Cal.App.3d at p. 481 [no discovery even though potential discoverer "could have verified" information supporting theft].)  In all events, because no actual victims of the Authotecq scheme had been identified at the time of Cartwright's complaint, substantial evidence supports the jury's finding the securities fraud was not yet discovered.  (See *People v. Fine* (1997) 52 Cal.App.4th 1258, 1267, fn. 13 [substantial evidence supported no discovery of section 25110 offense when state agency was unaware that "unqualified securities had been sold by the defendants to the victims listed in the information.  While [the agency] clearly was aware prior to that date that defendants did not have a permit to sell securities and the victims were aware of the fact of their purchase of the securities at the time they were made, there was no conjunction of the victims' knowledge with that of the [agency]"].)

Chapman further argues Lipton could have discovered the crimes through reasonable diligence because she was "authorized to issue administrative subpoenas which she likely could have used to obtain Authotecq financial records."  But Lipton did not issue a subpoena for Authotecq's bank records until she spoke with victim Verly and learned where Verly had deposited his

18

investment.  Chapman does not persuasively explain how Lipton could have used subpoenas to uncover Authotecq's finances using the limited information obtained from Cartwright.  (See *Crossman*, *supra*, 210 Cal.App.3d at p. 482 ["defendant does not suggest . . . what inquiry [the government or the victim] might have made in the exercise of reasonable diligence which would have led to discovery of the crime"].)

B.    *Jury Instructions*

For the first time on appeal, Chapman argues the jury received faulty instructions on the statute of limitations and on evidence of an uncharged conspiracy.  He asserts these defective jury instructions affected his substantial rights.

1.    *Standard of Review*

"Generally, a party forfeits any challenge to a jury instruction that was correct in law and responsive to the evidence if the party fails to object in the trial court.  [Citations.]  The rule of forfeiture does not apply, however, . . . if the instructional error affected the defendant's substantial rights." (*People v. Franco* (2009) 180 Cal.App.4th 713, 719 (*Franco*).)  "'Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was.'" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1087; accord, *Franco*, at p. 720 ["Instructional error affects a defendant's substantial rights if the error was prejudicial under the applicable standard for determining harmless error."].)  We interpret jury instructions "to support the judgment rather than

19

defeat it if they are reasonably susceptible to such interpretation."  (*People v. Laskiewicz* (1986) 176 Cal.App.3d 1254, 1258.)

"'When we review challenges to a jury instruction as being incorrect or incomplete, we evaluate the instructions as a whole, not in isolation.  [Citation.]  "For ambiguous instructions, the test is whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction."'"  (*People v. Nelson* (2016) 1 Cal.5th 513, 544.)

> 2.  *The Jury Was Correctly Instructed on the Statute of Limitations*

Chapman argues the jury instruction on the statute of limitations was incomplete and affected his substantial rights by lessening the prosecution's burden of proof.  The trial court instructed with a modified version of CALJIC No. 4.74, instead of CALCRIM No. 3410.[6]

---

[6]    As modified, the instruction read:

This action was commenced on the day of January 8, 2015.

You may convict the defendant of Grand Theft, Fraud in the Offer or Sale of a Security, or Fraudulent Securities Scheme only if the fraud and theft was discovered or completed within four years of the commencement of the action, whichever is later.

However, you may not convict the defendant of Grand Theft, Fraud in the Offer or Sale of a Security, or Fraudulent Securities Scheme if you find that, in the exercise of reasonable diligence on the part of the alleged victim or the criminal law enforcement authorities, the fraud and theft should have been discovered at a

Chapman raises five defects with CALJIC No. 4.74. First, he asserts it was deficient because it instructs that "[t]he People have the burden of proving by a preponderance of the evidence that prosecution of this case began within the required time," but the instruction, does not define "preponderance of the evidence." Chapman admits, however, that the preponderance standard was defined elsewhere in the instructions delivered to the jury, specifically in CALCRIM No. 418.[7] We must assess prejudice to Chapman's substantial rights "'in the context of the instructions as a whole,'" and "'"'we must assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.'"'" (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 475 (*Sattiewhite*).) For this reason, the omission

time more than four years before the commencement of the action.

The word "discovered," as used in this instruction, does not mean mere awareness of loss or misconduct; nor does mere loss or misconduct in and of itself suggest a likelihood of fraud or theft.

"Discovered" means an awareness that there has been loss or misconduct and that it was caused by criminal agency.

"Reasonable diligence" means the usual care exercised by the ordinary, prudent person in the conduct of his or her affairs.

Even though the People must prove that the defendant is guilty beyond a reasonable doubt, the People must only prove by a preponderance of the evidence that the fraud or theft was discovered, as herein defined, within four years of the commencement of the action.

[7] The People further note CALCRIM No. 375, which the jury received, also included a definition of "preponderance of the evidence."

of the definition from CALJIC No. 4.74 did not affect Chapman's substantial rights because it was cured by the definition available in CALCRIM No. 418. (See *People v. Smith* (2008) 168 Cal.App.4th 7, 13 ["The absence of an essential element from one instruction may be cured by another instruction or the instructions taken as a whole."]; *People v. Jeffries* (2000) 83 Cal.App.4th 15, 22 ["""The fact that the necessary elements of a jury charge are to be found in two instructions rather than in one instruction does not, in itself, make the charge prejudicial."""].)

Second, Chapman argues "CALJIC No. 4.74 was not modified to state that the DOC is a law enforcement agency, and the jury was not instructed of this fact." In the context of the parties' closing arguments, however, the jury was not misled. (See *People v. Young* (2005) 34 Cal.4th 1149, 1202 [reviewing court "must consider the arguments of counsel in assessing the probable impact of the instruction on the jury"]; accord, *People v. Kumar* (2019) 39 Cal.App.5th 557, 564.) Addressing the statute of limitations in their closing arguments to the jury, Chapman's attorney and the prosecutor focused on Lipton's discovery of the fraud offenses. In closing, both attorneys stated Lipton was an employee of the DOC, a government agency, who conducted an investigation into the fraud. Because it was clear Lipton held a government position enforcing the securities law, and the parties agreed her discovery of the fraud was dispositive of the statute of limitations issue, the jury was not misled and Chapman's substantial rights were not violated. (See *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248-1249 [holding "incomplete instruction" was cured by defendant's closing argument, which "adequately informed the jury" of the issue]; accord, *People v.*

*Quinonez* (2020) 46 Cal.App.5th 457, 463-466 [holding jury instructions were adequate where closing argument clarified definition of key term]; *People v. Tatman* (1993) 20 Cal.App.4th 1, 11 [any "remote doubt" as to sufficiency of jury instructions "was dispelled during closing argument, when both the prosecutor and defense counsel emphasized" the issue].)

Third, Chapman argues CALJIC No. 4.74's definition of "discovered" is ambiguous and confusing. The definition reads: "The word 'discovered,' as used in this instruction does not mean mere awareness of loss or misconduct; nor does mere loss or misconduct in and of itself suggest a likelihood of fraud or theft. [¶] 'Discovered' means an awareness that there has been loss or misconduct and that it was caused by criminal agency." According to Chapman, this language "conflict[s]" with the definition provided in *Zamora, supra*, 18 Cal.3d at page 562: "'The statute commences to run . . . after one has knowledge of facts sufficient to make a reasonably prudent person suspicious of fraud, thus putting him on inquiry.'" The definition provided by CALJIC No. 4.74 stated a different aspect of the standard for discovery, but was legally correct and well-supported by case law. (See, e.g. *Petronella, supra*, 218 Cal.App.4th at p. 956 ["'[D]iscovery of a loss by the victim *alone* is insufficient to trigger the running of the limitations period: "Literally, . . . discovery of a loss, without discovery of a criminal agency, is not enough."'"]; *People v. Soni* (2005) 134 Cal.App.4th 1510, 1519.) For this reason, the instruction's definition of "discovered" did not prejudice Chapman's substantial rights.

Fourth, Chapman says the instruction did not specify the jury needed to consider when each charged offense was discovered, but instead referred to "the fraud and theft."

Chapman argues "because [the jury] was not instructed on the alleged dates of the offenses it may have been prevented from accurately determining whether any particular count was barred by the statute of limitations." In the context of the facts and arguments at trial, this instruction did not affect Chapman's substantial rights. At trial, Chapman did not argue, for instance, that the individual victims discovered the individual offenses at different times. Chapman argued only that Lipton should have discovered all offenses from Cartwright's complaint, and as a result, "the case shouldn't have been here in the first place because it was beyond the statute of limitations." The People maintained Lipton discovered the fraud only after Verly's complaint, thus all charges were brought within the statute of limitations. Because we must ""assume that jurors are intelligent""" (*Sattiewhite, supra*, 59 Cal.4th at p. 475), it does not follow that the jurors would have accepted Chapman's theory of discovery of the offenses and also convicted Chapman on all counts.

Fifth, and finally, Chapman argues "[t]he most significant deficiency in CALJIC No. 4.74 is that it does not state . . . [that] reasonable diligence is evaluated from the perspective of the person or law enforcement officer *in the same circumstances*." It was clear to the jury, however, that in determining whether Lipton exercised reasonable diligence it was to consider Lipton's circumstances. The instruction directed jurors to consider "reasonable diligence on the part of . . . the criminal law enforcement authorities," referring to the actions of the specific individual involved in discovering the case: Lipton. Accordingly, the jury was correctly instructed on the statute of limitations in Chapman's case.

### 3. *The Jury Was Also Correctly Instructed on Evidence of an Uncharged Conspiracy*

Chapman next challenges CALCRIM No. 416, which the trial court used to instruct the jury on conspiracy theory liability. "California Supreme Court decisions have "'long and firmly established that an uncharged conspiracy may properly be used to prove criminal liability for acts of a coconspirator.""" (*People v. Smothers* (2021) 66 Cal.App.5th 829, 870.) In this circumstance, the trial court may give jury instructions based on a conspiracy theory to show liability for a substantive offense. (See *ibid.*) Chapman argues the jury received a deficient instruction on evidence of an uncharged conspiracy.

Specifically, Chapman argues the instruction misled the jury into convicting him on all charged offenses, "even if it found that he only entered into a conspiracy to commit one of the charged offenses, or a lesser number of the charged offenses." CALCRIM No. 416 instructs that a defendant is criminally liable as a member of a conspiracy if "[t]he defendant intended to agree and did agree with one or more of the [coconspirators] . . . to commit Grand Theft, Fraud in the Offer or Sale of a Security, *or* Fraudulent Securities Scheme." (CALCRIM No. 416 [emphasis added].) Chapman argues the conjoining "or" in the instruction allowed the jury to hold him liable for all charged offenses, even if the jury believed he conspired to commit just one or two of the three categories of charges.[8]

---

[8] Chapman also argues CALCRIM No. 416 allowed the jury to convict him based on coconspirators' acts outside the scope of the conspiracy. Chapman concedes, however, the instruction specifically stated "[a] member of a conspiracy is criminally

25

In the context of the whole instruction, we do not believe the jury was misled by the language Chapman identifies. As delivered at Chapman's trial, CALCRIM No. 416 goes on to instruct: "The People contend that the defendants conspired to commit one of the following crimes: Grand Theft, Fraud in the Offer or Sale of a Security, or Fraudulent Securities Scheme. You may not find a defendant guilty under a conspiracy theory unless all of you agree that the People have proved that the defendant conspired to commit at least one of these crimes, *and you all agree which crime he conspired to commit.*" (CALCRIM No. 416 [emphasis added].) This portion of the instruction ensures the jury "agree[s] unanimously the defendant is guilty of a *specific* crime" articulated in the instruction and "is designed in part to prevent the jury from amalgamating evidence of multiple offenses." (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) We must assume the jury understood and faithfully followed this charge. (See *People v. Barber* (2020) 55 Cal.App.5th 787, 799 (*Barber*) ["'The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions.'"].) Further, CALCRIM No. 416 referred the jurors to the underlying instructions on the elements of each offense charged under a conspiracy theory, emphasizing

_____

responsible for the acts or statements of any other member of the conspiracy done to help accomplish the goal of the conspiracy." There is no reasonable likelihood the jury misinterpreted this language in the way Chapman contends. (See *People v. Campos* (2007) 156 Cal.App.4th 1228, 1237-1238 [holding the "only reasonable understanding" of an instruction stating a defendant must be acquitted unless "'the evidence proves [him] guilty beyond a reasonable doubt'" included the negative: that a "lack of evidence could lead to reasonable doubt"].)

the jurors must consider the "separate instructions" on those crimes in determining the defendant's intent to commit each crime.

In light of the full instruction, there was no instructional error and no harm to Chapman's substantial rights. (See *People v. Sandoval* (2020) 50 Cal.App.5th 357, 361 ["it is improper to assess the correctness of the instruction[] . . . by focusing exclusively on the use of 'or' in [a] phrase"]; *People v. Stone* (2008) 160 Cal.App.4th 323, 331 ["[A] jury instruction cannot be judged on the basis of one or two phrases plucked out of context."].)

Chapman next asserts the language of CALCRIM No. 416 is legally erroneous because it "allowed the jury to find [him] guilty of the charged offenses based on a conspiracy to commit criminal negligence." As noted above, the jury here was instructed with CALCRIM No. 416, authorizing liability for the securities fraud offenses based on a conspiracy theory. The trial court also instructed the jury on the securities fraud offenses in Corporations Code sections 25401 and 25541.[9]

---

[9] Supplemental Instruction 1 stated the elements of the crime in section 25401 as follows:

1.    The defendant[] willfully offered for sale or sold a security in this state;

2.    The offer for sale or sale was made by means of an oral or written communication;

3.    Such oral or written communication either: [¶] a. Included an untrue statement of a material fact; [¶] OR [¶]
      b. Omitted to state a material fact which omission made a statement misleading; [¶] AND

27

Chapman argues the criminal negligence instruction compromised his substantial rights when partnered with the conspiracy liability instruction. In his view, sections 25401 and 25541 are crimes of strict liability, meaning there is no requirement the defendant possess a mental state of wrongful intent or guilty knowledge. (See *People v. Sargent* (1999) 19 Cal.4th 1206, 1223 [defining a strict liability offense]; *People v.*

---

4. At the time they made the offer or sale, the defendant[] either: [¶] a. knew the falsity or misleading nature of a statement or the materiality of an omission; [¶] OR [¶] b. was criminally negligent in failing to acquire such knowledge. [¶] "Criminally negligent" means conduct that is more than ordinary negligence. Ordinary negligence is the failure to exercise reasonable care. Criminal negligence refers to a negligent act which is aggravated, reckless, or flagrant and which is a gross departure from what would be conduct of an ordinary prudent and careful person under the circumstances.

Supplemental Instruction 2 stated the elements of the crime in section 25541:

1. That a security was offered for sale or sold in this state;

2. In connection with the offer or sale of the security the defendants, directly or indirectly, did one of the following: [¶] a. Willfully employed a device, scheme or artifice to defraud; [¶] OR [¶] b. Engaged in an act, practice or course of business which operates or would operate as a fraud or deceit on any person. AND

3. That the person did so with the specific intent to defraud or was criminally negligent.

Supplemental Instruction 2 included the same definition of "criminally negligent" as Supplemental Instruction 1.

*Simon* (1995) 9 Cal.4th 493, 519 (*Simon*).) He notes that conspiracy is a crime of specific intent requiring the defendant's intent to achieve a resulting harm. (See *People v. Atkins* (2001) 25 Cal.4th 76, 86; *People v. Hood* (1969) 1 Cal.3d 444, 457.) Because one cannot conspire to commit a crime without intent to commit the crime, Chapman argues he was convicted of securities fraud on a contradictory and legally faulty theory of conspiracy. Chapman cites homicide cases where courts have held it is legally impossible to conspire to commit implied malice murder because conspiracy to commit murder requires specific intent to kill and implied malice murder does not. (See, e.g., *People v. Swain* (1996) 12 Cal.4th 593, 607.)

We are unpersuaded. Our Supreme Court has held section 25401 is not a strict liability offense but a crime of general intent requiring "mens rea or guilty knowledge." (*People v. Salas* (2006) 37 Cal.4th 967, 976.) The Court interpreted section 25401 to require the defendant's "knowledge of the falsity or misleading nature of a statement or of the materiality of an omission, or criminal negligence in failing to investigate and discover them." (*Simon, supra*, 9 Cal.4th at p. 522.)

Further, *People v. Koenig* (2020) 58 Cal.App.5th 771 (*Koenig*) squarely rejected Chapman's argument. *Koenig* considered whether a defendant could be convicted of section 24501 offenses on a theory of conspiracy liability. (*Id.* at p. 794.) *Koenig* observed the actus reus of section 25401, offering and selling securities, must be willful, not negligent. (*Id.* at p. 795.) The court explained that, in the context of section 24501, criminal negligence was "an alternative way of proving the knowledge element"—not the actus reus. (*Id.* at p. 796.) For this

reason, the court disagreed that section 24501 liability on a conspiracy theory amounted to conspiracy to commit negligence. (*Id.* at p. 795.) The court rejected any comparison between implied malice murder and securities fraud. (*Id.* at p. 798.)

Chapman asserts *Koenig* "reached the wrong conclusion" because securities fraud "can be established by negligent conduct." But as explained by the high court, section 24501 plainly incorporates "a requirement that the conduct be 'willful.'" (*Simon*, *supra*, 9 Cal.4th at p. 507; see Corp. Code, §§ 25401, 25540.) Section 25541 incorporates the same requirement. (See Corp. Code, §§ 25540, 25541.) For this reason, the trial court did not err by instructing the jury on conspiracy theory liability for the securities fraud charges.

C.     *Consolidation of Grand Theft Counts Under* Bailey

For the first time on appeal, Chapman argues his conviction on 74 separate counts of grand theft should have been consolidated into just one count of grand theft—or, alternatively, one count of grand theft for each victim—under *Bailey, supra,* 55 Cal.2d 514. Because Chapman's offenses involved multiple victims, and substantial evidence supports Chapman acted pursuant to multiple impulses and plans for each victim, we determine this argument is unmeritorious.

1.     *Legal Background and Standard of Review*

*Bailey* decided that when "as part of a single plan a defendant makes false representations and receives various sums from the victim[,] the receipts may be cumulated to constitute but one offense of grand theft." (*Bailey, supra,* 55 Cal.2d at p. 518.) *Bailey* provided a test for "determining if there were separate

30

offenses or one offense": "whether the evidence discloses one general intent or separate and distinct intents." (*Id.* at p. 519.) The defendant in *Bailey* made a misrepresentation when applying for welfare benefits, then continued to collect an excess of welfare payments for years.[10] (*Id.* at pp. 515-516.)

"Whether multiple takings are committed pursuant to one intention, one general impulse, and one plan is a question of fact for the jury based on the particular circumstances of each case. [Citations.] As with all factual questions, on appeal we must review the record to determine whether there is substantial evidence to support a finding that the defendant harbored multiple objectives." (*People v. Jaska* (2011) 194 Cal.App.4th 971, 983-984 (*Jaska*).) At trial, Chapman's counsel did not request, and the trial court did not offer a *Bailey* instruction. The jury thus made no finding on whether Chapman committed the theft pursuant to one intent or separate and distinct intents. In this circumstance, "[t]he *Bailey* doctrine applies as a matter of law only in the absence of any evidence from which the jury could

---

[10]     *People v. Whitmer* (2014) 59 Cal.4th 733 (*Whitmer*) limited *Bailey*, holding "a defendant may be convicted of multiple counts of grand theft based on separate and distinct acts of theft, even if committed pursuant to a single overarching scheme." (*Id.* at p. 741.) *Whitmer* recognized, however, this new interpretation could not constitutionally apply to defendants who "'could not have foreseen'" the change in the law "'at the time of the alleged criminal conduct.'" (*Id.* at p. 742.) *Whitmer* was decided in 2014, after the Authotecq scheme concluded in 2011. Accordingly, the rule clarified in *Whitmer* does not apply to Chapman, so we apply *Bailey*. (See *People v. Nilsson* (2015) 242 Cal.App.4th 1, 13-14 [applying *Bailey* rule, not *Whitmer* rule, because *Whitmer* does not apply to crimes committed during the time the *Bailey* doctrine remained valid].)

31

have reasonably inferred that the defendant acted pursuant to more than one intention, one general impulse, or one plan." (*Id.* at p. 984.) In other words, if in the case before us there is any evidence from which the jury could have inferred more than one intention, general impulse, or plan, the doctrine does not apply.

2. *Chapman Is Not Entitled to Consolidation of the Counts Into a Single Theft Conviction*

The trial evidence does not establish as a matter of law that Chapman committed all 74 grand theft counts against different victims with "one intention, one general impulse, or one plan." (*Jaska*, *supra*, 194 Cal.App.4th at p. 984.) "In deciding whether a defendant commits a series of thefts pursuant to a single intent or plan, we do not use a single, broad objective of stealing property. A defendant who steals from multiple victims over a lengthy crime spree may have a single objective of obtaining as much money or property as possible. However, he has still committed multiple offenses." (*People v. Mitchell* (2008) 164 Cal.App.4th 442, 456.) In this vein, *Bailey*'s application has "generally been limited to thefts involving a single victim" (*People v. Tabb* (2009) 170 Cal.App.4th 1142, 1149) because "*Bailey* itself implies aggregation may occur only when the offense was committed against one victim" (*In re David D.* (1997) 52 Cal.App.4th 304, 309). Here, Chapman's offenses involved multiple victims over the course of eight years. For this reason alone, the evidence does not establish as a matter of law that Chapman acted pursuant to one intention, general impulse, or plan. (See *People v. Reid* (2016) 246 Cal.App.4th 822, 834 [*Bailey* did not apply where the defendant stole "the property of separate victims" on a single occasion]; *People v. Butler* (2012)

32

212 Cal.App.4th 404, 413, 430 [same, where the defendant defrauded "more than 100 victims" and the defendant "took a new commission" from each victim]; *People v. Garcia* (1990) 224 Cal.App.3d 297, 308 [same, where defendant sold fraudulent bonds to multiple victims].)

3.      *Chapman Is Also Not Entitled to Consolidation of the Counts Into One Conviction for Each Victim*

Similarly, the evidence does not establish as a matter of law that Chapman pursued thefts against each individual victim pursuant to one single intention, impulse, or plan. The evidence showed, over the eight-year course of the offenses, that Chapman developed new fraudulent investment materials and increasingly exaggerated business projections for Authotecq—including eight different PPMs. Authotecq's salespeople repeatedly contacted investors with these new materials to solicit more investments. Defrauded investors, including Etter, Anderson, Mills, and Joyce, testified these new projections and representations induced them to invest various sums repeatedly over many months and years. On these facts, *Bailey* does not support aggregation of the offenses as a matter of law. (Compare *Bailey*, *supra*, 55 Cal.2d at pp. 515-516, 519-520 [aggregating theft offenses where the defendant made one misrepresentation in an application for welfare benefits, resulting in regular overpayments], with *Jaska*, *supra*, 194 Cal.App.4th at pp. 984-985 [holding *Bailey* does not apply where defendant "stole various sums of money in an opportunistic manner" and "committed numerous fraudulent acts over a four-year period" against a single victim].)

33

4.    *Failure To Instruct on* Bailey

Chapman also contends the trial court had a duty to instruct the jury on *Bailey*.  Because Chapman did not request any instruction at trial, and the *Bailey* doctrine was inconsistent with Chapman's trial defense, the trial court had no duty to instruct on *Bailey*.  "Generally, the trial court is required to instruct the jury on the general principles of law that are closely and openly connected with the evidence and that are necessary to the jury's understanding of the case."  (*Barber*, *supra*, 55 Cal.App.5th at p. 799.)  The trial court's sua sponte duty to instruct the jury on a particular defense is "limited, arising 'only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.'"[11]  (*People v. Barton* (1995) 12 Cal.4th 186, 195.)  "'[T]his limitation on the duty of the trial court is necessary not only because it would be unduly burdensome to require more of trial judges, but also because of the potential prejudice to defendants if instructions were given on defenses inconsistent with the theory relied upon.'"  (*People v. Watts* (1976) 59 Cal.App.3d 80, 84.)

_____

[11]    Chapman asserts the court had an absolute sua sponte duty to instruct on *Bailey* because it "is more closely related to the elements of an offense for which the trial court must sua sponte correctly instruct the jury . . . than an affirmative defense the defendant must request."  We disagree.  As *Whitmer* demonstrates, *Bailey* is a judge-made doctrine generally raised as a defense.  (See *Whitmer*, *supra*, 59 Cal.4th at pp. 736-743.)

34

Chapman's defense at trial asserted his complete lack of involvement in the Authotecq fraud. Chapman testified he did not prepare any of the misleading PPMs, he lacked knowledge of and control over the significant commissions earned by Authotecq salespeople, and he received payments from Authotecq through his companies Shadoworks and IQSecure for legitimate purposes. An instruction on the *Bailey* doctrine, directing the jury to determine whether Chapman committed the thefts with a single intent or plan, would have conflicted with Chapman's defense that he did not participate in the Authotecq thefts whatsoever. (See *People v. Jo* (2017) 15 Cal.App.5th 1128, 1169 [holding affirmative defense instruction conflicted with defendant's defense because it "required defendant to acknowledge, if only inferentially, the existence of facts which she otherwise denied"]; *People v. Maury* (2003) 30 Cal.4th 342, 425 [holding affirmative defense instruction on mistake of fact would conflict with defendant's defense that he was entirely innocent].) Accordingly, there was no error.

D.    *Alleged Juror Misconduct*

Chapman argues the trial court should have held a second evidentiary hearing to investigate alleged juror misconduct.

1.    *Relevant Factual and Procedural Background*

In October 2018, two months after Chapman's conviction, Chapman filed a petition alleging juror misconduct and seeking disclosure of juror identification information, pursuant to section 237, subdivision (b). Chapman alleged an alternate juror had overheard two jurors stating, "they believed defendant CHAPMAN was guilty of the alleged crime, absent any evidence

the defense put forth." He further alleged that another, unidentified juror stated "her God compelled her to punish Defendant Chapman irrespective of any defense" because a defrauded victim had testified he blamed Wallace Thomas, Chapman's co-conspirator, for the death of the victim's wife.

The trial court determined Chapman's petition presented a prima facie showing of good cause to disclose the jurors' identification information. The court ordered disclosure of the identifying information of Alternate Juror No. 3, the juror behind the allegations of misconduct, and it further ordered Alternate Juror No. 3 to appear at an evidentiary hearing. The trial court invited all jurors in the case to be heard on the matter, and at least five other jurors submitted declarations in response to the allegations.

At the hearing, Alternate Juror No. 3 testified to the allegations in the petition. Alternate Juror No. 3 also raised new allegations: At the end of the trial, Alternate Juror No. 3 heard a third juror loudly question the credibility of a witness before jury deliberation began, based on the juror's experience serving in the military. Additionally, Alternate Juror No. 3 testified that after the verdict, a juror told him she felt other jurors "bullied her into giving her answer because they said that English was not her first language and that she didn't understand what she was talking about."

Alternate Juror No. 3 then testified to his interactions with the other jurors and with Chapman's defense team. Based on a post-verdict conversation by the courthouse elevator with the other jurors and the defense team, Alternate Juror No. 3 testified he believed Thomas, an accomplice of Chapman and prosecution witness, "could have lied on the stand" because he had "served

36

his time and got out, and that a part of him getting out was to testify during this trial." He admitted to sending text messages saying, "I agree [Thomas] is probably already back in Mexico" and "[a] lot of info we didn't have came out and I think it could have been helpful during the case, like how [Thomas] isn't going back to jail for three years. He's already served his sentence and served less than a year. The prosecution couldn't come after him since he's served [the sentence], and he basically said anything on the stand."[12]

Alternate Juror No. 3 also admitted to giving a list of the jurors' contact information to Chapman's defense team without their knowledge or permission, and to lying to other jurors when they confronted him about releasing their personal information. He further admitted to arguing with two of the jurors who confronted him. Alternate Juror No. 3 told one of those jurors: "Now that you and [other juror] have pissed me off, I will talk to the [defense] attorneys. I didn't before and I didn't share the list, but since I am being accused of something I didn't do, I will be singing like a canary to the attorneys."

Finally, Alternate Juror No. 3 acknowledged he disagreed "strongly" with the jury verdict and "did not personally feel that one of the two defendants was guilty for every single count." When asked why he did not come forward earlier with the alleged misconduct that happened during the trial, Alternate Juror No. 3 stated he "didn't know" and questioned "who am I to say if I am to come up to a judge or not to say 'This is what's going on.'"

---

[12] Under the terms of his plea agreement, Thomas testified for the prosecution and received a reduced sentence of three years. The agreement provided he must testify truthfully, or he faced greater sentencing exposure of up to 88 years.

Alternate Juror No. 3 denied being contacted by a prosecution investigator about his allegations of misconduct, while admitting he turned over juror contact information to and discussed the misconduct with the defense team.

After hearing testimony from Alternate Juror No. 3, the trial court concluded there was no good cause to disclose juror information for other jurors. The court expressly based its decision on Alternate Juror No. 3's lack of credibility. The court remarked: "I am making a credibility call, and motivation is important to credibility. And I think [Alternate Juror No. 3's] motivation started out there at the elevator where he heard these things; whether he heard it directly from the defense or whether they said it to the other jurors and they repeated it while he was out of earshot. I think that highly affects his credibility and motivation." The court further found, "I didn't find him that credible from the witness stand. He kept volunteering stuff. He wouldn't answer the questions directly." The court finally noted the declarations from the other jurors did not support Alternate Juror No. 3's testimony on any "critical" points.

2. *Applicable Law and Standard of Review*

The identification information of jurors in a criminal case is sealed after delivery of the verdict. (Code Civ. Proc., § 237, subd. (a)(2).) After trial, a defendant may "petition the court for access to personal juror identifying information within the court's records necessary for the defendant to communicate with jurors for the purpose of developing a motion for new trial or any other lawful purpose." (Code Civ. Proc., § 206, subd. (g).) If the petition sets forth a prima facie showing of "good cause," and there is no compelling interest against disclosure, the trial court

38

"shall set the matter for hearing" to determine whether good cause exists to release the jurors' information. (Code Civ. Proc., § 237, subd. (b).)

In this context, good cause requires "'a sufficient showing to support a reasonable belief that jury misconduct occurred.'" (*People v. Cook* (2015) 236 Cal.App.4th 341, 345 (*Cook*).) Additionally, the alleged misconduct must be "'of such a character as is likely to have influenced the verdict improperly.'" (See *People v. Jefflo* (1998) 63 Cal.App.4th 1314, 1322; accord, *Zamora*, *supra*, 73 Cal.App.5th at p. 1089.) "Good cause does not exist where the allegations of jury misconduct are speculative, conclusory, vague, or unsupported." (*Cook*, at p. 346.) We review the trial court's denial of a section 237 petition for abuse of discretion. (*People v. Santos* (2007) 147 Cal.App.4th 965, 978.)

### 3. *The Trial Court's Credibility Determination Is Amply Supported*

Chapman argues "[t]he court lacked a sufficient basis to conclude that [Alternate Juror No. 3] was not credible." He asserts this alternate juror was "a very professional, educated guy" and it "seems highly unlikely that such an individual would commit perjury." Chapman also says Alternate Juror No. 3 was credible because he admitted he had personally committed misconduct by discussing the case with other jurors during the trial.

"The power to judge the credibility of witnesses and to resolve conflicts in the testimony is vested in the trial court, and its findings of fact, express or implied, must be upheld if supported by substantial evidence." (*In re Carpenter* (1995) 9 Cal.4th 634, 646 [assessing claim of juror misconduct]; accord,

39

*People v. Nesler* (1997) 16 Cal.4th 561, 581.) Here, the trial court's credibility determination was supported by substantial evidence. Alternate Juror No. 3 testified he believed the jury verdict was incorrect and Thomas had lied on the stand. (See *People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1462-1464 [substantial evidence for adverse credibility determination because juror who alleged misconduct believed the defendant's sentence was not a fair punishment].) After hearing the testimony, the court also observed Alternate Juror No. 3 "wouldn't answer the questions directly" and "kept volunteering stuff," undermining his credibility. (See *People v. Peterson* (2020) 10 Cal.5th 409, 473 [upholding adverse credibility finding where juror's "hesitation . . . before issuing a denial [of misconduct] was 'the longest pause I've ever seen'"]; accord, *People v. Williams* (2015) 61 Cal.4th 1244, 1262 [emphasizing credibility determinations are based "'on firsthand observations unavailable to us on appeal'"].) On the whole, there was ample evidence supporting the trial court's finding Alternate Juror No. 3 was not credible. (See *People v. Fayed* (2020) 9 Cal.5th 147, 175 [upholding report of juror misconduct as credible where juror did not "'lie[]'" and was "forthcoming and detailed in his account"].)

4. *The Trial Court Did Not Abuse Its Discretion By Denying a Second Evidentiary Hearing*

Chapman argues the trial court should have held a second evidentiary hearing based on the declarations submitted by other jurors. He points to statements in the declarations of Juror No. 1 and Juror No. 4, asserting "at least one of the jurors may have prejudged the case" or tried to discuss the case during trial, and "toward the end of trial two jurors had discussed appellant being

40

guilty, even though another juror characterized the exchange between the two jurors as joking around."

There was no abuse of discretion. Although two jurors made light of the situation by saying they should find Chapman and Patawaran guilty to end their service on the jury, the trial court expressly considered these comments and concluded there was no misconduct. (See *Zamora, supra,* 73 Cal.App.5th at p. 1088 [affirming no good cause to disclose juror information where juror stated in jest, "'let's just find him guilty so we can get this over with'"]; *People v. Diaz* (2015) 235 Cal.App.4th 1239, 1244 ["Our Supreme Court has warned that petitions to access confidential juror records "'should not be used as a 'fishing expedition' to search for possible misconduct."'"].)[13]

E.     *Staying the Sentence on Count 270 Under Section 654*

Citing section 654's prohibition on multiple punishments, Chapman argues the trial court should have stayed his sentence on the fraudulent securities scheme count, count 270, because it amounts to multiple punishment for the same conduct underlying the 69 securities fraud counts. Although Chapman did not assert this claim of error in the trial court, "a section 654 claim is not waived by failing to object" in the trial court. (*People v. Hester* (2000) 22 Cal.4th 290, 295.) This is because "a court acts in excess of its jurisdiction and imposes an unauthorized sentence

---

[13]     Chapman also argues that "[i]f this Court finds any of the issues raised . . . forfeited due to any act or omission of appellant's trial counsel," we should consider whether he received effective assistance of counsel. Because we considered Chapman's arguments on the merits, we need not address this argument.

when it fails to stay execution of a sentence under section 654." (*Ibid.*)

### 1.    *Relevant Law and Standard of Review*

As relevant here, section 654, subdivision (a), provides: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision."  "The statutory purpose underlying section 654 'is to ensure that a defendant's punishment will be commensurate with his culpability.'" (*People v. Kelly* (2018) 28 Cal.App.5th 886, 904.)  To this end, "[s]ection 654 precludes multiple punishment for a single act or indivisible course of conduct punishable under more than one criminal statute." (*People v. Cleveland* (2001) 87 Cal.App.4th 263, 267.)  "Whether a course of conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the 'intent and objective' of the actor." (*Ibid.*)  "If all of the crimes were merely incidental to, or were the means of accomplishing or facilitating one objective, a defendant may be punished only once." (*People v. Perry* (2007) 154 Cal.App.4th 1521, 1525 (*Perry*).)  On the other hand, if a defendant "'harbored "multiple criminal objectives," which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, "even though the violations shared common acts or were parts of an otherwise indivisible course of conduct."'" (*People v. Kenefick* (2009) 170 Cal.App.4th 114, 125 (*Kenefick*).)

"The defendant's intent and objective are factual questions for the trial court." (*People v. Coleman* (1989) 48 Cal.3d 112, 162.) "A trial court's implied finding that a defendant harbored a separate intent and objective for each offense will be upheld on appeal if it is supported by substantial evidence." (*People v. Blake* (1998) 68 Cal.App.4th 509, 512.) "'We review the court's determination of [a defendant's] "separate intents" for sufficient evidence in a light most favorable to the judgment, and presume in support of the court's conclusion the existence of every fact the trier of fact could reasonably deduce from the evidence.'" (*People v. Andra* (2007) 156 Cal.App.4th 638, 640-641.)

> 2.    *Section 654 Requires Staying Chapman's Sentence on Count 270, Because Substantial Evidence Does Not Support That Chapman Harbored Multiple Criminal Objectives*

We conclude Chapman's convictions for securities fraud and participating in a fraudulent securities scheme did not entail multiple criminal objectives, and thus the trial court should have stayed Chapman's sentence on the fraudulent securities scheme count.

Chapman was sentenced on 69 counts of securities fraud under Corporations Code section 25401, which provides: "It is unlawful for any person to offer or sell a security in this state, or to buy or offer to buy a security in this state, by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading."

43

Chapman was also sentenced on one count (count 270) of using a scheme to defraud under Corporations Code section 25541.  Subdivision (a) of that section authorizes conviction of "[a]ny person who willfully employs, directly or indirectly, any device, scheme, or artifice to defraud in connection with the offer, purchase, or sale of any security or willfully engages, directly or indirectly, in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the offer, purchase, or sale of any security."

Chapman argues his convictions for securities fraud and using a scheme to defraud involved the same course of conduct and shared the same objective:  "obtaining monetary investments in securities from the alleged victims."

The People contend Chapman engaged in two separate courses of conduct based on separate criminal objectives.  As to count 270, the People assert Chapman "r[an] a scheme to defraud investors" by "forming, incorporating, and running Authotecq," "hiring employees, drafting PPMs, acquiring Valetpay and rebranding it Paysentinel, and setting up additional corporations, IQSecure and Shadoworks, into which he funneled his money."  The People describe count 270 as "directed to appellant's leading role in creating the infrastructure that allowed for the individual instances of securities fraud to take place."  As to the 69 securities fraud counts, the People assert "these counts were directed to the individual fraudulent sales of Authotecq securities to the individual victims . . . that took place on different and specific dates.  And the objective of those individual instances of securities fraud was not to run a securities scheme but to fund the company . . . by taking money from the victims."

44

Substantial evidence does not support the trial court's implied finding that Chapman harbored multiple criminal objectives and acted in two separate courses of conduct between the securities fraud and fraudulent securities scheme counts. While the People assert that the sales to investors were simply "to fund the company," the securities scheme aimed to "defraud investors," this argument presents a distinction without a difference. Instead, the evidence shows that Chapman had one criminal objective: to steal from investors through the sale of worthless securities. First, the fraudulent securities scheme count and the securities fraud counts shared the same timeframe (August 7, 2003 to July 20, 2011) and the same alleged conduct.

Further, the evidence shows Chapman's activities running the securities scheme were "the means of accomplishing or facilitating" the securities fraud. (See *Perry, supra,* 154 Cal.App.4th at p. 1525.) Chapman's actions running Authotecq—drafting misleading PPMs, failing to develop the purported technology, and draining investor funds into his personal accounts—were the very means by which he defrauded the individual investors. (See *Kenefick, supra,* 170 Cal.App.4th at p. 125 [staying forgery sentence under section 654 where defendant forged deed to sell a fraudulent investment, because "the forgeries were preliminary steps in the plan to steal [victim's] money" and "simply the means by which [defendant] accomplished her theft"]; *Burris v. Superior Court* (1974) 43 Cal.App.3d 530, 535 [applying § 654 where "it is readily apparent that his principal objective . . . was to unlawfully obtain money from the county (grand theft), with the unlawful practice of law and perjury being incidental to and in furtherance of this objective"].)

45

Indeed, where the defendant has also been convicted of securities fraud under Corporations Code section 25401, courts have stayed the sentence on fraudulent securities scheme counts. (See, e.g., *Koenig, supra*, 58 Cal.App.5th at p. 815 ["If defendant, as charged in count 2, 'employed a device, scheme, or artifice to defraud,' . . . it was through the offer and sale of [company's] securities to investor victims. Thus, the essence of count 2 was the same as that underlying the section 25401 counts. Indeed, punishment on count 2 . . . was stayed under Penal Code section 654."]; *People v. Smith* (2009) 179 Cal.App.4th 986, 988-989, 1001.)

F.      *Resentencing Under Assembly Bill No. 518*

Chapman argues, the People concede, and we agree he is entitled to resentencing under Assembly Bill No. 518, which went into effect on January 1, 2022. Assembly Bill No. 518 amended section 654, subdivision (a), to read: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision."

"Previously, where Penal Code section 654 applied, the sentencing court was required to impose the sentence that 'provides for the longest potential term of imprisonment' and stay execution of the other term. [Citation.] As amended by Assembly Bill 518, Penal Code section 654 now provides the trial court with discretion to impose and execute the sentence of either term, which could result in the trial court imposing and executing the shorter sentence rather than the longer sentence." (*People v. Mani* (2022) 74 Cal.App.5th 343, 379 (*Mani*).) Chapman requests remand for the trial court to consider whether to impose a shorter

46

sentence by staying the sentence on the securities fraud counts and imposing the sentence on the grand theft counts.

Because Assembly Bill No. 518 imparted new discretion to impose a lower sentence, under the rule of *In re Estrada* (1965) 63 Cal.2d 740, it is ameliorative legislation that applies retroactively to all cases not final when it took effect on January 1, 2022. (See *People v. Fugit* (2023) 88 Cal.App.5th 981, 995-996; *People v. Jones* (2022) 79 Cal.App.5th 37, 45; *Mani, supra,* 74 Cal.App.5th at p. 379.) Accordingly, we remand to the trial court to reconsider Chapman's sentence in light of Assembly Bill No. 518.

G.    *Resentencing Under Senate Bill No. 567*

Chapman also argues he is entitled to resentencing under Senate Bill No. 567.

1.    *Legal Background and Standard of Review*

Senate Bill No. 567, effective January 1, 2022, amended section 1170, subdivision (b), to limit the discretion of sentencing courts. (*People v. Zabelle* (2022) 80 Cal.App.5th 1098, 1108 (*Zabelle*).) At the time Chapman was sentenced, former section 1170, subdivision (b), authorized the sentencing court to impose an upper, middle, or lower term sentence within its discretion, considering the "interests of justice." (*People v. Lopez* (2022) 78 Cal.App.5th 459, 464 (*Lopez*), quoting former section 1170, subd. (b).)

Senate Bill No. 567 significantly altered this sentencing scheme. Under the new section 1170, subdivision (b), the middle term is the presumptive sentence, unless "there are circumstances in aggravation of the crime that justify the

47

imposition of a term of imprisonment exceeding the middle term."
(§ 1170, subds. (b)(1)-(2).) The facts underlying any aggravating circumstances must be "stipulated to by the defendant" or "have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (*Id.*, subd. (b)(2).)

Chapman contends, the People concede, and we agree Senate Bill No. 567 is ameliorative legislation that applies retroactively to Chapman's case. (See *Zabelle*, *supra*, 80 Cal.App.5th at p. 1108; *People v. Dunn* (2022) 81 Cal.App.5th 394, 403, review granted Oct. 12, 2022, S275655; *Lopez*, *supra*, 78 Cal.App.5th at p. 464.) Chapman and the People disagree, however, whether remand is warranted for resentencing.

The Courts of Appeal have disagreed on the standard of review for sentencing error in light of the amendments to section 1170, subdivision (b), and our Supreme Court has taken up the issue. (See *People v. Lynch* (May 27, 2022, C094174) [nonpub. opn.], review granted Aug. 10, 2022, S274942.) Until the Supreme Court provides further guidance, we follow the approach in *Zabelle*, *supra*, 80 Cal.App.5th at pages 1111 to 1112, and *Lopez*, *supra*, 78 Cal.App.5th at pages 465 to 467.

Under *Zabelle* and *Lopez*, we consider first whether it is reasonably probable that the jury would have found each aggravating fact not true. (See *Zabelle*, *supra*, 80 Cal.App.5th at p. 1112; *Lopez*, *supra*, 78 Cal.App.5th at p. 466.) We may uphold the trial court's consideration of an aggravating fact if we conclude, beyond a reasonable doubt, that the jury would have found the fact true beyond a reasonable doubt. (See *Zabelle*, at p. 1111 [applying the *Chapman* standard for assessing constitutional error, based on Sixth Amendment right to jury

48

trial[14]].)  Second, we consider whether "the trial court would have exercised its discretion to impose the upper term" based on the aggravating factors properly before the court.  (*Lopez*, at p. 467 [emphasis omitted]; accord, *Zabelle* at p. 1112 [applying *Watson* standard for state law error under section 1170[15]].)

 2. *Chapman's Sentencing*

Prior to Chapman's sentencing, the prosecution submitted six aggravating circumstances in support of an upper-term sentence:  (1) the crime involved acts disclosing a high degree of cruelty, viciousness, or callousness; (2) the victims were particularly vulnerable; (3) appellant induced others to participate in the commission of the crime or occupied a position of leadership or dominance of other participants; (4) the manner in which the crime was carried out indicates planning, sophistication, or professionalism; (5) the crime involved an attempted or actual taking or damage of great monetary value; and (6) Chapman took advantage of a position of trust or confidence to commit the offense.

The probation department also submitted a pre-sentencing report.  Their report endorsed aggravating factors (2), (4), (5), and (6).  The probation report also identified one circumstance in mitigation:  that Chapman had no prior significant record of criminal conduct.

---

[14]  *Chapman v. California* (1967) 386 U.S. 18.

[15]  *People v. Watson* (1956) 46 Cal.2d 818.

At sentencing, the trial court exercised its discretion to impose the upper term of five years on the base count, count 102, and the upper term of five years on the enhancement under section 186.11, subdivision (a)(2).  The court stayed, but did not strike, Chapman's sentence on the section 186.11 enhancement, reasoning Chapman's "substantive sentences" "adequately carried out" punishment for "the amount and the extent of the fraud here."  In support of the upper-term sentence, the court cited the "criminal sophistication, planning and professionalism" involved; Chapman's taking advantage of his "position of trust and confidence"; the "significant period of time" over which the crimes took place; and "the amount of the loss" by the victims. Chapman did not stipulate to these aggravating factors, nor did the jury find them beyond a reasonable doubt.

3.  *Chapman Is Entitled to Resentencing Under Amended Section 1170, Subdivision (b), Because the Sentencing Error Was Not Harmless*

Chapman asserts resentencing is necessary because the jury did not make specific findings on any of the aggravating factors relied on by the court, nor did Chapman stipulate to such facts.  Chapman also argues that, although the jury found he took more than $500,000 pursuant to the section 186.11 sentencing enhancement, the sentencing court could not rely on this finding to impose an upper-term sentence relating to the taking of "great monetary value."  For these reasons, Chapman urges that the trial court's violation of the amended section 1170 is not harmless.

50

We agree with Chapman. First, we cannot conclude the jury would have found true beyond a reasonable doubt all the aggravating facts relied on by the sentencing court. (See *Zabelle*, *supra*, 80 Cal.App.5th at pp. 1111-1112; *Lopez, supra*, 78 Cal.App.5th at p. 466.) Although the trial court believed Chapman committed the offenses by "taking advantage of a position of trust and confidence," the evidence showed Chapman had almost no direct contact with investors and his name only appeared on Authotecq offering materials once. Indeed, several Authotecq investors testified they did not know who Chapman was. As to Chapman's "criminal sophistication, planning and professionalism" and the taking of "great monetary value," these factors are somewhat "subjective" and it is "'difficult for a reviewing court to conclude with confidence that, had the issue been submitted to the jury, the jury would have assessed the facts in the same manner as did the trial court.'" (*People v. Lewis* (2023) 88 Cal.App.5th 1125, 1139, review granted May 17, 2023, S279147; see *People v. Sandoval* (2007) 41 Cal.4th 825, 840 ["Many of the aggravating circumstances . . . require an imprecise quantitative or comparative evaluation of the facts," including "whether the crime 'involved . . . [a] taking or damage of *great monetary value*."].)

Finally, we agree with Chapman that the court could not properly consider the jury's finding, pursuant to the section 186.11 enhancement, that Chapman took more than $500,000 as a basis for finding Chapman took "great monetary value." Under section 1170, subdivision (b)(5), the trial court "may not impose an upper term by using the fact of any enhancement upon which sentence is imposed under any provision of law." Rule 4.420(g) of the California Rules of Court

51

clarifies that "a fact charged and found as an enhancement may be used as a reason for imposing a particular term only if the court has discretion to strike the punishment for the enhancement and does so." The trial court stayed Chapman's sentence on the section 186.11 enhancement, but did not strike the enhancement.

Moving to the second step of the harmless error analysis, we also cannot conclude the trial court would have imposed the same upper-term sentence without the full slate of aggravating factors it utilized. This is true even if we assume the jury would have found beyond a reasonable doubt that Chapman stole "great monetary value" or exercised "criminal sophistication." (See *People v. Butler* (2023) 89 Cal.App.5th 953, 962, review granted May 31, 2023, S279633 [resentencing warranted even assuming all aggravating factors but one were permissible].) As in *Zabelle*, "[t]he trial court gave no particular weight to any of its listed aggravating circumstances. Nor did it indicate whether its decision to impose the upper term was (or was not) a close call." (*Zabelle, supra*, 80 Cal.App.5th at p. 1115; see *Lopez, supra*, 78 Cal.App.5th at p. 468 [remanding for resentencing where "the court relied on a long list of aggravating factors in selecting the upper term" but "offered no indication that it would have selected an upper term sentence even if only a single aggravating factor or some subset of permissible factors were present"].)

In sum, resentencing is necessary "to allow the trial court the opportunity to exercise its discretion to make its sentencing choice in light of the recent amendments to section 1170." (*Lopez, supra*, 78 Cal.App.5th at p. 468.)

H.    *Amending Clerical Errors in the Sentencing Minute Orders and Abstract of Judgment*

The parties agree that correction of certain clerical errors in the abstract of judgment and the sentencing minute orders is warranted.  We also agree.  If the record reflects clerical errors in the abstract of judgment, "an appellate court. . . 'may correct such errors on its own motion or upon the application of the parties.'" (*People v. Mitchell* (2001) 26 Cal.4th 181, 187-188 [collecting cases].)

Accordingly, the clerk of the superior court is directed to amend the abstract of judgment and sentencing minute orders as follows:  Count 102 shall replace count 105 as the base term of the sentence.  Count 123, a dismissed charge, shall be stricken from the abstract and the sentencing minute orders.  The abstract shall reflect a concurrent three-year sentence pursuant to count 93, a stayed three-year sentence on count 201, and a concurrent three-year sentence on count 202.  The abstract's description of counts 74 and 93 shall be amended to "fraud in the offer or sale of a security," the description of count 186 to "fraud in the offer of a security," and the description of count 269 as "fraud in the offer of a security."  The abstract shall be further amended to list the statutory provision of all security fraud counts as "CC 25401-25540(b)," the provision for count 269 as "CC 25401," and the provision for count 270 as "CC 25541."

## DISPOSITION

The judgment of conviction is affirmed.  We reverse and vacate the sentence, and remand with directions to the trial court to resentence Chapman pursuant to amended section 1170,

subdivision (b), amended section 654, and any other applicable ameliorative legislation.  We also direct the trial court to stay Chapman's sentence on count 270 pursuant to section 654, and to modify the sentencing minute orders and the abstract of judgment as indicated in the opinion.


                                MARTINEZ, J.

We concur:


        SEGAL, Acting P. J.



        FEUER, J.